NEVADA-CALIFORNIA POWER CO. v. HAMILTON, County Treasurer, et al.

SAME v. FRANKLIN, County Treasurer, et al.

(District Court, D. Nevada. June 19, 1916.)

Nos. A-31, A-32.

1. COURTS &mdash;328(1)—FEDERAL COURTS—JURISDICTION—DIVERSITY OF CITIZENSHIP.

The federal District Court has jurisdiction of a suit involving $3,000 or more, where the parties are citizens of different states.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 890; Dec. Dig. &mdash;328(1).]

2. COURTS &mdash;303(2)—ACTIONS AGAINST STATE—FEDERAL COURTS—JURISDICTION.

Despite the constitutional amendment depriving the federal courts of jurisdiction of a suit against a state by a private individual, the federal courts may take jurisdiction of a suit to enjoin state or county officers from illegal exactions under color of state tax statutes.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 844½; Dec. Dig. &mdash;303(2).]

3. TAXATION &mdash;397—AUTHORITY OF STATE—PROPERTY WITHOUT STATE.

Complainant, whose power plant and water rights are located in California, owns transmission lines extending into southern Nevada, where the greater part of its electric current is sold. Though the more valuable

part of plaintiff's property was located in California, that state taxed it on about 15 per cent. of the value of its entire property. *Held*, that the state of Nevada could not, on the theory that practically 85 per cent. of its income was derived from Nevada, tax plaintiff on a valuation made from capitalizing such income at 10 per cent., for, as the income necessarily resulted from current generated in California, the state of Nevada could not, though the state of California had not taxed plaintiff on all its property, impose taxes on property not located in Nevada.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 672; Dec. Dig. ⊛397.]

4. TAXATION ⊛397—INTERSTATE CORPORATIONS—CARRIERS.

Where an interstate corporation, as a carrier or irrigation company, owns property in several states, each state, for purposes of taxation, may value the entire property and impute a fair proportion of the aggregate value to that portion lying within its borders.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 672; Dec. Dig. ⊛397.]

5. TAXATION ⊛397—INTERSTATE CORPORATIONS—ASSESSMENT.

The most valuable portion of complainant's property is permanently located in California, and 85 per cent. of its transmission lines are in Nevada. If the value of the entire property for the purpose of taxation is ascertained by capitalizing its net earnings, and 85 per cent. of this valuation is assessed as the value of the company's property in Nevada, simply because 85 per cent. of the company's transmission line mileage is in Nevada, the assessment is bad.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 672; Dec. Dig. ⊛397.]

6. TAXATION ⊛608(12)—LIENS—CLOUD ON TITLE.

Under Rev. Laws Nev. § 3666, making a tax deed conclusive evidence of title, except as against actual fraud or payment of taxes by one not a party, enforcement of an illegal tax assessment, under which proceedings were about to be brought to sell land for taxes, will be enjoined, for a tax deed based on such proceedings would constitute a cloud on the title.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 1241; Dec. Dig. ⊛608(12).]

7. TAXATION ⊛397—ASSESSMENTS—MODE OF TAXATION.

In assessing the property of an interstate corporation, engaged in the sale of electric power and water, it is improper to capitalize the earnings of the whole property and ascribe the total value to the distributing lines as a mode of assessing such lines for taxation.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 672; Dec. Dig. ⊛397.]

8. TAXATION ⊛608(5)—ASSESSMENTS—FRAUDULENT ASSESSMENTS.

Where taxing officials assess in a manner which they must know will produce inequalities and unjust assessments, their acts are to be treated as arbitrary or fraudulent.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 1234; Dec. Dig. ⊛608(5).]

9. TAXATION ⊛542—ASSESSMENTS—RECOVERY OF TAXES ILLEGALLY EXACTED.

Where an assessment of taxes on real property was not wholly void, but was excessive, the taxes, if paid, cannot be recovered in an action against the taxing officials, the payment, though made under protest, being presumed to be voluntary.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1003–1005; Dec. Dig. ⊛542.]

⊛For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**10. TAXATION ⬳608(10)—COLLECTION—INJUNCTION—ADEQUATE REMEDY AT LAW.**

Act Nev. March 20, 1913 (Laws 1913, c. 134) § 7, declares that any property owner who has instituted court proceedings for redress from any increased valuation of his property, and who shall have paid his December installment of taxes in full, may, on filing with the treasurer of the county a certificate of the clerk of any court that such issue is pending, pay his June installment in two separate payments, one payment in a sum which, when added to the December installment, will represent the amount of taxes payable if computed on the valuation of the preceding fiscal year, plus the valuation of any improvement, and the other for the balance required to make up the full June installment, which sum shall be held to be disposed of according to the result of the litigation. Plaintiff's assessment was so raised in 1914 that payment of the December installment would result in payment of a sum in excess of the taxes payable under the prior valuation; the taxes being payable in two equal installments. *Held*, that section 7 did not afford plaintiff an adequate remedy at law, and so plaintiff might, being a foreign corporation, sue in the federal courts to enjoin the collection of the illegal assessment.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 1239; Dec. Dig. ⬳608(10).]

**11. REMOVAL OF CAUSES ⬳41—RIGHT TO REMOVAL—DIVERSITY OF CITIZENSHIP.**

An action by the state, under Rev. Laws Nev. §§ 3657–3664, to collect taxes, cannot, though the defendant be a foreign corporation, be removed to the federal courts on the grounds of diversity of citizenship, because the state is not a citizen.

[Ed. Note.—For other cases, see Removal of Causes, Cent. Dig. §§ 82½–84; Dec. Dig. ⬳41.]

**12. REMOVAL OF CAUSES ⬳25(1)—RIGHT TO REMOVAL—CONSTITUTIONAL QUESTIONS.**

An action instituted in the state courts cannot be removed to the federal courts, on the ground that a question arising under the Constitution or laws of the United States is involved, unless the complaint necessarily shows that such questions are involved; it being insufficient that they be raised by the other pleadings, or in anticipation of defenses.

[Ed. Note.—For other cases, see Removal of Causes, Cent. Dig. §§ 58, 59; Dec. Dig. ⬳25(1).]

**13. COURTS ⬳259—JURISDICTION—FEDERAL COURTS—EQUITY.**

Despite Judicial Code (Act March 3, 1911, c. 231) § 267, 36 Stat. 1163 (Comp. St. 1913, § 1244), providing that suits in equity shall not be sustained in any court of the United States where a plain, adequate, and complete remedy at law may be had, the several states cannot, save in so far as the federal courts apply their remedies, restrict the equitable jurisdiction of the federal courts, which, unless abridged by Congress, is coextensive with that of the English Court of Chancery at the time of the Revolution.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 795, 796; Dec. Dig. ⬳259.]

**14. COURTS ⬳335(1)—STATE AND FEDERAL COURTS.**

An adequate remedy at law, which can be administered only in a state court, is not sufficient to compel a federal court to dismiss an equitable cause over which its jurisdiction is otherwise valid and complete, and relegate the complainant for his only alternative relief to a state court.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 902, 903, 906, 907; Dec. Dig. ⬳335(1).]

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

15. TAXATION ⊕⇒490—ASSESSMENT—NATURE.

An assessment imposed by the Nevada tax commission, created by Act Nev. March 20, 1913, is conclusive, and has the effect of a judgment, in the absence of fraud.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 872, 873; Dec. Dig. ⊕⇒490.]

16. TAXATION ⊕⇒608(9)—INJUNCTION—JURISDICTION—ADEQUATE REMEDY AT LAW.

Judicial Code, § 267, declares that suits in equity shall not be sustained in any court in the United States where a plain, adequate, and complete remedy may be had at law. The property of plaintiff, a foreign corporation, which was located in Nevada, was assessed at an excessive rate. Rev. Laws Nev. § 3664, enumerating the defenses against tax suits, which enumerates fraud in the assessment, or failure to comply with the provisions of the act, provides that the defense that the assessment is out of proportion to the actual value of the property assessed shall be effectual only as to the excess. Held, that as a tax suit by the state of Nevada against plaintiff could not be removed by plaintiff to the federal court on the ground of diversity of citizenship, though plaintiff was a foreign corporation, as the defense against an excessive assessment, which could be interposed at law, was not available in the federal courts, and as a state cannot restrict the jurisdiction of the federal courts, the federal District Court had jurisdiction to entertain a suit by plaintiff to enjoin enforcement of an excessive assessment; it having no plain and adequate remedy at law.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 1238; Dec. Dig. ⊕⇒608(9).]

In Equity. Suits by the Nevada-California Power Company, a corporation, against Joseph Hamilton, as Treasurer and ex officio Tax Receiver of the County of Esmeralda, and others, and against Nathaniel K. Franklin, in his capacity as Treasurer and ex officio Tax Receiver of the County of Nye, and others. Injunctions pendente lite granted.

John R. Dixon, of Los Angeles, Cal., and Newman Jones, of Riverside, Cal., for plaintiffs.

George B. Thatcher, Atty. Gen., of Nevada, J. A. Sanders, Dist. Atty., of Tonopah, Nev., and M. A. Diskin, Dist. Atty., of Goldfield, Nev., for defendants.

FARRINGTON, District Judge. June 24, 1914, the Nevada Tax Commission established the full cash value of plaintiff's property within this state at $1,492,815. Sixty per cent. of this was taken for the purposes of taxation, making the assessed value $895,689. As between the interested counties, this amount was apportioned $328,689 to Nye and $565,000 to Esmeralda. Mr. Shaughnessy, chairman of the Tax Commission, testifies that:

"In finding the said $1,492,815 as the full cash valuation of complainant's property, and $895,689 for assessment purposes, the Commission took into account its nonphysical values, as well as the purely physical elements. The sum taken therefore was believed to cover the overhead costs incurred in the construction of the property, and also the franchise element contemplated by section 5 of the Tax Commission Law, in making up the collective unit valuation of the Power Company's property."

⊕⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In October, 1914, the Power Company appeared before the Commission, complaining that this valuation was excessive, and would operate as an unlawful, unjustifiable, and unconstitutional discrimination, whereby it would be deprived of the equal protection of the laws of the state of Nevada. Instead of reducing the valuation, the Commission raised it to $3,700,713, 60 per cent. of which, or $2,221,417, was fixed as the value for purposes of taxation. The effect of this change was to increase the Nevada tax of complainant from $21,850.29 to $53,517.82. The Power Company then brought the present suits, one against Joseph Hamilton, in his capacity as treasurer and ex officio tax receiver of the county of Esmeralda, and Michael A. Diskin, in his capacity as district attorney of the said county of Esmeralda, and Cylde P. Johnson, in his capacity as auditor of the said county of Esmeralda, and the other against Nathaniel K. Franklin, in his capacity as treasurer and ex officio tax receiver of the county of Nye, and John A. Saunders, in his capacity as district attorney of the said county of Nye, and William M. Grimes, in his capacity as auditor of the said county of Nye. In each the prayer was that it be adjudged that the full cash value of plaintiff's property in Nevada at any time during the year 1914 was and is the sum of $1,220,843; that the valuation fixed for that year by the Nevada Tax Commission was and is unjust and inequitable, and in so far as it exceeds 60 per cent. of said $1,220,-843 it is wholly void, and of no force or effect; that complainant be granted writs of injunction, both temporary and permanent, restraining the enforcement of the valuations or orders of the Nevada Tax Commission as against plaintiff, or from commencing or prosecuting any action or actions at law for the enforcement of said valuations and orders, or for the collection of any tax claimed thereunder; and that the treasurer of Nye county be directed to accept and receive $6,321.25, and the treasurer of Esmeralda county $11,382.60, or such other sums as the court may adjudge, in full payment of all taxes levied or assessed against plaintiff within said counties for the year 1914.

Both suits are now before the court on complainant's application for orders of injunction pendente lite. Both applications have been heard together, and will be disposed of in this opinion.

[1, 2] 1. Complainant is a corporation organized and existing under the laws of the state of Wyoming; all the defendants are residents and citizens of Nevada. The amount in controversy in each case exceeds $3,000. The cases, therefore, are within the jurisdiction of this court, unless they are in reality suits against the state, and therefore within the inhibition of the constitutional amendment, which declares the judicial power of the United States shall not extend to suits against a state. It would be an unfortunate construction of that amendment which would prohibit application to federal courts to protect rights guaranteed by the federal Constitution itself, when illegally invaded by state or county officials. These are not suits against the state, but against individuals, threatening wrong under color of authority from the state.

It is alleged and admitted that, unless restrained, defendants will levy on complainant's property, advertise it as delinquent, take each step prescribed by statute for the enforcement of taxes exceeding $300, and thus compel payment of the taxes here complained of. If the assessment be illegal, excessive, and fraudulent, defendants' acts thereunder and in connection therewith, if purely ministerial, will constitute a trespass. If the suits were against an official, as representative of the state, not specially charged with the execution of the injurious acts, or threatening to perpetrate them, then the state would be the real party in interest and the real defendant. In that event, both suits could be dismissed, because, as we know, the state cannot, without its consent, be brought into court at the suit of a private individual. On the other hand, when a state or county official has committed, or is threatening to commit, an illegal or unconstitutional act under color of authority from the state, he is shielded by none of the state's immunity from suit; he becomes himself an actor; he incurs the liability of, and may be proceeded against as, the principal tortfeasor.

In Hopkins v. Clemson Agricultural College, 221 U. S. 636, 642, 31 Sup. Ct. 654, 656, 55 L. Ed. 890, 894, 35 L. R. A. (N. S.) 243, 249, the rule and its reasons are thus clearly stated:

"Immunity from suit is a high attribute of sovereignty—a prerogative of the state itself—which cannot be availed of by public agents when sued for their own torts. The eleventh amendment was not intended to afford them freedom from liability in any case where, under color of their office, they have injured one of the state's citizens. To grant them such immunity would be to create a privileged class, free from liability for wrongs inflicted or injuries threatened. Public agents must be liable to the law, unless they are to be put above the law. For how 'can these principles of individual liberty and right be maintained if, when violated, the judicial tribunals are forbidden to visit penalties upon individual offenders * * * whenever they interpose the shield of the state? * * * The whole frame and scheme of the political institutions of this country, state and federal, protest' against extending to any agent the sovereign's exemption from legal process. Poindexter v. Greenhow, 114 U. S. 270, 291 [5 Sup. Ct. 903, 29 L. Ed. 185]. The many claims of immunity from suit have therefore been uniformly denied, where the action was brought for injuries done or threatened by public officers. If they were indeed agents, acting for the state, they—though not exempt from suit—could successfully defend by exhibiting the valid power of attorney or lawful authority under which they acted. Cunningham v. Macon & B. R. Co., 109 U. S. 446, 452 [3 Sup. Ct. 292, 609, 27 L. Ed. 992]. But if it appeared that they proceeded under an unconstitutional statute, their justification failed, and their claim of immunity disappeared on the production of the void statute. Besides neither a state nor an individual can confer upon an agent authority to commit a tort, so as to excuse the perpetrator. In such cases the law of agency has no application—the wrongdoer is treated as a principal, and individually liable for the damages inflicted, and subject to injunction against the commission of acts causing irreparable injury."

The distinction between suits against officers as representatives of the state, and suits against officers threatening in the name of the state to do illegal and unconstitutional acts, is recognized in the authorities cited by defendants. For instance, in Ex parte Ayers, 123 U. S. 443, 444, 8 Sup. Ct. 164 (31 L. Ed. 216) it is said:

"The court does not intend to impinge upon the principle which justifies suits against individual defendants who, under color of the authority of unconstitutional state legislation, are guilty of personal trespasses and wrongs; nor to forbid suits against officers in their official capacity either to arrest or direct their official action by injunction or mandamus, where such suits are authorized by law, and the act to be done or omitted is purely ministerial, in the performance or omission of which the plaintiff has a legal interest."

In Fitts v. McGhee, 172 U. S. 516, 529, 530, 19 Sup. Ct. 269, 274 (43 L. Ed. 535) the court says:

"Upon examination it will be found that the defendants in each of those cases were officers of the state, specially charged with the execution of a state enactment alleged to be unconstitutional, but under the authority of which, it was averred, they were committing or were about to commit some specific wrong or trespass to the injury of the plaintiff's rights. There is a wide difference between a suit against individuals, holding official positions under a state, to prevent them, under the sanction of an unconstitutional statute, from committing by some positive act a wrong or trespass, and a suit against officers of a state merely to test the constitutionality of a state statute, in the enforcement of which those officers will act only by formal judicial proceedings in the courts of the state. In the present case, as we have said, neither of the state officers named held any special relation to the particular statute alleged to be unconstitutional. They were not expressly directed to see to its enforcement."

In Union Trust Co. v. Stearns (C. C.) 119 Fed. 791, 793, this language occurs:

"There is a class of cases in which the Supreme Court has held that a suit against state officers was not a suit against the state. The principle governing these cases is not applicable to the present suit. Briefly stated, that principle is that such officers, as individuals, have committed, or are about to commit, a wrong or trespass, for which they are personally liable in a suit at law or in equity."

In the light of these authorities, the mere fact that the state is much concerned in this litigation is no reason why county officials should not be restrained from the commission of wrongs and injuries to complainant, though done in behalf of the state. To the same effect see 5 Pomeroy, Eq. Jurisp. § 366; Gregg v. Sanford, 65 Fed. 151, 154, 12 C. C. A. 525; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 391, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Harrison v. St. L. & San F. R. R. Co., 232 U. S. 318, 34 Sup. Ct. 333, 58 L. Ed. 621, L. R. A. 1915F, 1187; Taylor v. L. & N. R. Co., 88 Fed. 350, 356, 31 C. C. A. 537; Coulter v. Weir, 127 Fed. 897, 907, 62 C. C. A. 429.

[3] 2. Mr. Shaughnessy, chairman of the Nevada Tax Commission, testifies that at the October meeting of that body the value of the property in question was found by ascertaining the net profits of the Power Company for the year ending June 30, 1914; it then "ascribed 85 per cent. of those net profits to the state of Nevada, and capitalized that 85 per cent. on a 10 per cent. basis." The calculation in detail was as follows:

"I have given gross earnings for the fiscal year ending June 30, 1914, $992,928. Thereafter the following deductions were taken: Operating expenses, $339,115: taxes, $18,435; annuity or return on the property, 4 per cent. on $5,000,000, total plant valuation claimed, or $200,000—making total deductions $557,550. Taking that amount from gross earnings leaves net income of $435,378. Taking 85 per cent. of that as creditable to Nevada, gives

$370,071.30, and that capitalized at 10 per cent. will give $3,700,713. Sixty per cent. of that, which was taken for assessment purposes, gives $2,220,427. Then there is detail there, 'Less original assessment ordered on roll June.24, 1914, $895,689,' leaves $1,324,738, which is the corrected net increase ordered on the tax rolls of Nye and Esmeralda counties on November 14th."

Elsewhere Mr. Shaughnessy testifies that the $5,000,000 allowed "represents pretty closely the appraised valuation claimed for rate fixing purposes before the Public Service Commission of Nevada by complainants." He also explains the annuity of $200,000 as an allowance to cover depreciation. When asked why 85 per cent. of the Power Company's profits were credited to Nevada, he replied:

"It is upon the testimony given by Mr. Cooper before the Commission on October 22d, and is predicated upon the fact that practically all of the earnings of the Nevada-California Power Company are made within Nevada, notwithstanding the fact that the generating plant itself is located within California, upon Bishop creek, in Inyo county, and necessarily a certain amount of the transmission mileage is located within that state. The California taxing authorities, for the purpose of assuring their amount of taxes due in that state, put on a computed tax in lieu of a tax upon the body of the property. There they find the proportion of the earnings creditable to California by the proportion of the transmission line mileage within the state of California to the total transmission line mileage of the system."

Mr. Cooper's testimony before the Tax Commission, referred to by Mr. Shaughnessy, was as follows:

"Mr. Shaughnessy: What proportion of your taxes do you pay to California?

"Mr. Cooper: You mean the percentage of taxes of the entire company?

"Mr. Shaughnessy: Yes. What percentage in California do you pay upon?

"Mr. Cooper: Why, the laws in California are based upon the gross earnings. On a company such as ours, an interstate company, the tax is paid on the ratio of the mileage in the state of California to the whole.

"Mr. Shaughnessy: What is that ratio?

"Mr. Cooper: On the basis of the interstate mileage?

"Mr. Shaughnessy: Yes. What is that ratio?

"Mr. Cooper: The ratio—I don't recall the exact ratio, but I am under the impression it is somewhere around 13 per cent. of our total interstate business, in addition to which we have to pay on the gross value percentage on revenue entirely within the state of California.

"Mr. Shaughnessy: Then 13 per cent. of the gross earnings made in Nevada are taxed upon the gross earnings basis in California as your assessment in that state?

"Mr. Cooper: Approximately that. I would not be certain of that percentage.

"Mr. Shaughnessy: And the gross earnings for the last fiscal year period are what? ·

"Mr. Cooper: I haven't the figures of the earnings with me.

"Mr. Shaughnessy: You are sure that percentage factor of 13 per cent. is about correct?

"Mr. Cooper: I would not like to go on record as to the amount, because I did not know the question would be raised; but it is somewhere around 13 per cent. or 15 per cent., I am not positive.

"Mr. Shaughnessy: You are assessed this year upon a full cash valuation basis of $1,492,815, and, taking 60 per cent. of that, your total assessment, or your assessed valuation, is $895,689. Your net earnings for the previous year from operations were $733,434; your taxes were $16,500. Figuring depreciation at 4 per cent., which is in excess of the factor found by Mr. Gillette, on a $5,000,000 plant valuation, we find the depreciation is $200,000, or a total, including taxes, of $216,500, which, taken from the net earnings from operation, leaves the net income $515,934. Assuming there is 14 per cent. taken

from that—I have figured 14 per cent. for California—it leaves the net earnings creditable to the state of Nevada, or the net income, $392,160. Now, if that is capitalized at 10 per cent. (the highest capitalization factor used by any state in the United States for determining franchise value), it will give a valuation of $3,921,600. What would you say to an assessment of that kind?

"Mr. Cooper: Well; but I don't see how the state of Nevada is justified in taking into consideration property that is not owned in the state.

"Mr. Shaughnessy: But a property is worth what it will earn, Mr. Cooper.

"Mr. Cooper: It may be. But the valuation of our California property ought not to enter into the taxation in Nevada, and the earning ability of the plant in California.

"Mr. Colburn: Where is your largest market—California?

"Mr. Cooper: At the present time our largest market is in Nevada, although our California market is increasing rapidly."

Complainant's property, in the main, consists of water rights, pipe lines, flumes, canals, reservoirs, a generating plant, and lines of transmission and distribution. Practically all of this property, except about 85 per cent. of the transmission lines, is situated in California, and more than two-thirds of the value of the entire property is in that state. The Tax Commission found the net earnings of the company for the fiscal year ending June 30, 1914, were $435,378; capitalizing this at 10 per cent., the total value is $4,353,780. January 29th of the same year, the value of this property was ascertained by the Public Service Commission of Nevada for rate-making purposes. Mr. Shaughnessy, who was then and still is a member of that Commission, wrote the decision. The fair present value of the physical properties of the company in both states, the value on which it should be permitted to earn a reasonable income, he found to be $3,318,985.

The company claimed $1,412,000 as the value of its water rights, but Mr. Shaughnessy refused any allowance therefor in excess of original cost, which he fixed at $225,385. The remaining $1,186,615 he rejected as unearned increment. He was of the opinion that water rights should be treated as a franchise, and not valued above their original cost. Commissioner Bartine and Commissioner Simmons, constituting the majority of the Commission, held that water rights should be valued at what they are worth. They joined in the order fixing rates, because they were of the opinion that the rates prescribed would yield a fair return on the entire valuation, even if the full value for the water rights were included therein.

If the value of the water rights be added to the total value of other tangible property of the company in both states, we shall have about $4,505,600, which slightly exceeds $4,353,780, the value ascertained by capitalizing net earnings at 10 per cent. These figures fairly measure the value of the company's physical property in both states. The evidence shows clearly that more than two-thirds of this property is located in California. The whole of this valuation was evidently placed on the transmission and distributing lines, and 85 per cent. of it, or $3,700,713, credited to Nevada. Some of the reasons suggested for this do not even enjoy the merit of plausibility. If it be said this course was taken in order to reach intangible or franchise values in Nevada, it may be admitted that a figure reached by capitalizing net earnings should include the value of the franchise as well as the value

of the tangible property, but in this case the value so found is less than the value found by the Public Service Commission for the purely physical features of the property. There is no room in $4,353,780 for intangible value.

It is futile to urge that 85 per cent. of the company's income is earned in Nevada. There is no evidence to that effect. Eighty-five per cent. of the income may be collected in Nevada, because Nevada affords the company its principal market. The Commission utterly ignored the fact that the company earns a part of its income by the use of its water rights, reservoirs, ditches, pipe lines, and power plant. The company is engaged in two lines of business: It is a manufacturer, and as such its entire business is in California; there it generates all its power. It is also engaged in transmitting to, and selling electric power in, southern Nevada. If Nevada can capitalize all the net earnings of the company, both as a manufacturer in California and as a distributor in Nevada, and appropriate 85 per cent. of the capitalized value for assessment and taxation, why may not the Tax Commission of California with equal justice capitalize the gross earnings of the company in both states, and take the entire value thus ascertained, because all the property used in manufacturing the company's product is situated in that state? Furthermore, if 85 per cent. of the company's income is earned in Nevada, it necessarily follows that the earning power of each dollar invested by the company in Nevada transmission lines is more than 11-fold greater than the earning power of each dollar invested in the California water rights and power plant.

If the ownership of the power plant and transmission lines had been severed, it is not likely that the earnings of the former would have been used as a basis for ascertaining the value of the latter. Probably the Commission would have applied the rule thus: From the total receipts it would have deducted taxes, expenses, depreciation, and the amount paid to the owner of the generating plant for electric current; the remainder—the net proceeds—fairly capitalized, would constitute the value of the transmission lines, and this amount would have been apportioned between Nevada and California on a transmission line ratio. True, the power plant and water rights are serviceable to the company in its southern Nevada business, but they constitute no portion of the transmission and distributing lines. They bear the same relation to the lines that the fields, forests, and mines bear to a railroad; they furnish the product for transportation. Without such product the lines are of little or no value. The abundance of this product, and the extent of the market therefor, are material elements in fixing the value of the lines; and likewise the existence of the lines, and the market to which they bring the electricity, are important factors in determining the worth of the power plant and water rights. This relationship does not, however, in my judgment, authorize the Nevada Commission to spread the entire value of the power plant and water rights over the transmission lines.

As I have already said, the Tax Commission at its meeting in June, 1914, fixed the full cash value of the company's property in Nevada at $1,492,815. In December of the same year the value was fixed at

$3,700,713. It is suggested that during the interval, and in September, the annual report of the company for the fiscal year ending June 30, 1914, had been received, in which it appeared that the company was enjoying a gross income of $992,928, and a net income of $557,550, and that it was not until September "that the actual condition of this corporation, so far as its net revenue during that period of the year, was actually at hand for the benefit of the Tax Commission."

It is not unreasonable to assume that at the June meeting, when the valuation of $1,492,815 was fixed, the Commission had before it the company's report for the fiscal year ending June 30, 1913, in which it appeared that the gross earnings of the company for that year amounted to $947,096, and the net earnings to $533,435. The difference in the net earnings for the two years is not so large, standing by itself, as to suggest a raise in the valuation of over $2,200,000. It is difficult to escape the inference that the Tax Commission, at its December meeting, was making an original assessment, rather than equalizing values previously found.

It is impossible to conclude that the Commission making the assessment for 1914 considered anything but the earnings of the company. The evidence shows that the assessment of the property in California was based on gross earnings, and that the tax paid in California was in the ratio of the transmission mileage in that state to the whole mileage owned by the company. California took about 15 per cent.; the Nevada Commission then attempted to absorb the remaining 85 per cent. This state has no power, by any method or process known to the law, to gather to itself any tax on real property situated in California, because the authorities of that state fail to properly or adequately assess it.

It is not apparent that the valuation complained of included any assessment of intangible property. Furthermore, the method pursued, in view of the valuation fixed by the Public Service Commission of Nevada, does not indicate any purpose to reach intangible values. Ascribing 85 per cent. of complainant's net earnings, or 85 per cent. of its property, to Nevada, and claiming a portion thereof as intangible property, does not change the essential nature of the transaction. It was nothing more than an undertaking to appropriate for purposes of taxation property located in California. The entire value of power plant, reservoirs, water rights, and transmission lines, ascertained by capitalizing earnings of the whole property, was attributed to the transmission lines, and 85 per cent. of the total value was taken for Nevada, because 85 per cent. of the transmission lines are in Nevada.

Keokuk Bridge Co. v. People, 161 Ill. 132, 43 N. E. 691, was an action to recover judgment for taxes assessed on property consisting of a bridge across the Mississippi river between Illinois and Iowa. The Illinois assessment described the portion of the bridge claimed to be assessable in that state as extending "to the state line between the states of Illinois and Iowa," but did not state the length of the part so taken. The evidence disclosed that the part so valued extended to the draw, and about 850 feet west of the true state line, and thus into the state of Iowa. The lower court allowed the assessment record to

be amended, so as to precisely describe that part of the bridge in Illinois, but the valuation remained as before. Reversing the decision of the trial court, Justice Baker, speaking for the Supreme Court of Illinois, said:

"In the case at bar, the bridge, from the state line to the east end of the draw span, was not within the limits and jurisdiction of this state, and there was no power or authority to assess the same for taxation in this state. Said property was not subject to taxation here. The effect of including its value in the valuation that was made by the assessor was to render the assessment invalid. It would work an injustice and a fraud upon the rights of appellant to sell that part of its bridge that is in this state for the purpose of paying a tax levied here upon the value of its tangible property in Iowa, while at the same time such tangible property in Iowa is liable to taxation and sale in that state."

[4] 3. The courts have frequently held it proper to value the entire holdings of an interstate carrier, wherever located, as a unit, and to impute to the property of the carrier within the taxing state a fair proportion of the aggregate value. In fact, it is doubtful whether a reliable estimate of the true value of any fractional portion of such a property could be made, in the absence of data showing the value of the whole. In State Railroad Tax Cases, 92 U. S. 575, 608, 23 L. Ed. 663, where the distribution involved was among certain subordinate jurisdictions in the state of Illinois, Mr. Justice Miller said:

"It may well be doubted whether any better mode of determining the value of that portion of the track within any one county has been devised than to ascertain the value of the whole road, and apportion the value within the county by its relative length to the whole."

In Pittsburgh, etc., Railway Co. v. Backus, 154 U. S. 421, 430, 14 Sup. Ct. 1114, 1118 (38 L. Ed. 1031) Justice Brewer uses this language:

"It is ordinarily true that, when a railroad consists of a single continuous line, the value of one part is fairly estimated by taking that part of the value of the entire road which is measured by the proportion of the length of the particular part to that of the whole road. This mode of division has been recognized by this court several times as eminently fair."

In Fargo v. Hart, 193 U. S. 490, 499, 24 Sup. Ct. 498, 500 (48 L. Ed. 761) Mr. Justice Holmes says:

"It is held reasonable and constitutional to get at the worth of such a line, in the absence of anything more special, by a mileage proportion."

[5] 4. It is significant that, while the judges recognize the rule stated as being "eminently fair," "reasonable and constitutional," and possibly "the best method which has been devised," they suggest exceptional cases in which its application would be improper. For example, in the Fargo Case, supra, 193 U. S., at page 499, 24 Sup. Ct. at page 500 (48 L. Ed. 761), Mr. Justice Holmes says:

"It is obvious, however, that this notion of organic unity may be made a means of unlawfully taxing the privilege of property outside the state, under the name of enhanced value or good will, if it is not closely confined to its true meaning. So long as it fairly may be assumed that the different parts of a line are about equal in value a division of mileage is justifiable. But it is recognized in the cases that if, for instance, a railroad company had terminals in one state equal in value to all the rest of the line through

another, the latter state could not make use of the unity of the road to equalize the value of every mile. That would be taxing property outside of the state under a pretense."

In the last case the state of Indiana had taxed the American Express Company for its intangible assets, and had ascertained their value by taking a mileage proportional part of all the assets, including securities worth $15,500,000, which were located in New York, and were claimed by the company not to be used in its business. The state officials, however, contended that the securities were used by the company as a part of the necessary capital in its business, and as a part of its profit-producing plant. The Supreme Court, however, held that the effect of the state's action was to tax property outside the state, and that an injunction should be granted. It is also worth mentioning that the Express Company insisted that total mileage should include ocean as well as land lines of traffic. This proposition was rejected, because of the radical difference between the two classes of mileage.

In Western Union Tel. Co. v. Taggart, 141 Ind. 281, 40 N. E. 1051, 60 L. R. A. 671, the constitutionality of an Indiana statute was attacked on the ground that it permitted and required the assessment and valuation of property outside the state. Replying to this, the court said (141 Ind. 297, 40 N. E. 1055, 60 L. R. A. 697–698):

"The act, it is true, provides a method of valuation—the mileage method—as a basis for the taxation of certain property within the state of Indiana. But this is simply a means for determining the true cash value of the property within the state; and if in the case of appellant's property, or in any other case, it is shown to the board, or is discovered by them, that still further deductions should be made, on account of larger proportional values outside of the state, or for any other reason, then the board must make such deductions, so that, finally, only the property within the state of Indiana shall be assessed, and that at its true cash value. * * * It will therefore be presumed, in the absence of evidence to the contrary, that the state board has deducted from the total valuation of all interstate property such values, if any, of extrastate property, as will leave the remaining property within and without the state, as near as may be, of equal proportional value. * * * 'As, for instance, where the terminal facilities in some large city are of enormous value, and so give to a mile or two in such city a value out of all proportion to any similar distance elsewhere along the line of the road, or where in certain localities the company is engaged in a particular kind of business, requiring for sole use in such localities an extra amount of rolling stock. If testimony to this effect was presented by the company to the state board, it must be assumed, in the absence of anything to the contrary, that such board, in making the assessment, * * * took into account the peculiar and large value of such facilities and such extra rolling stock."

In the Delaware Tax Case, 18 Wall. 206, 230, 21 L. Ed. 888, the court was of the opinion that a tax apportioned on a mileage basis could not be sustained, if it necessarily fell on property outside the state. The following is a very clear statement of the conditions on which the conclusion was formed:

"In the second place, assuming that the tax is upon the property of the corporation, if the ratio of the value of the property in Delaware to the value of the whole property of the company be less than that which the length of the road in Delaware bears to its entire length, and such is admitted to be the fact, a tax imposed upon the property in Delaware according to the ratio of the length of its road to the length of the whole road

must necessarily fall upon property out of the state. The length of the whole road is in round numbers 100 miles; the length in Delaware is 24 miles. The tax upon the property estimated according to this ratio would be in Delaware $24/100$ or $6/25$ of the amount of the tax upon the whole property. But the value of the property in Delaware is not $6/25$ of the value of the whole property, but much less than this proportion would require."

In Louisville, etc., Co. v. Kentucky, 188 U. S. 385, 23 Sup. Ct. 463, 47 L. Ed. 513, it appeared that the company, a Kentucky corporation, was engaged in operating a ferry across the Ohio river between Louisville, Ky., and Jeffersonville, Ind. At the time of its organization the company acquired a franchise from the state of Kentucky; later it purchased a second franchise which had been granted by the state of Indiana. The Kentucky board of valuation and assessment capitalized the net earnings of the company for the previous year at 6 per cent., which produced the sum of $121,050. From this it deducted $54,164, the assessed value of the company's tangible property in both states. The remainder, $66,886, was then fixed as the value of the franchise for the purposes of taxation in Kentucky. In this the board followed closely a Kentucky statute, which declared that:

"The remainder thus found shall be the value of its corporate franchise subject to taxation as aforesaid."

The highest court of Kentucky sustained the assessment, declaring that the company was domiciled in Kentucky, and had its situs in Kentucky, and that there was no attempt to tax appellant's business, income, or revenues, but that the income was considered in fixing the value of the franchise. The case was then taken by writ of error to the Supreme Court of the United States, where it was decided that the board had included in its assessment the value of the Indiana franchise, as well as the value of the Kentucky franchise, and that Kentucky was thus attempting to tax a property right which had its situs in Indiana, and to deprive the company of "property without due process of law, in violation of the provisions of the Fourteenth Amendment."

In Delaware, L., etc., R. R. Co. v. Pennsylvania, 198 U. S. 341, 25 Sup. Ct. 669, 49 L. Ed. 1077, the court held that a state cannot tax property permanently outside its territorial jurisdiction, and that it could not accomplish that end by taxing the enhanced value of the capital stock of a corporation which arose from the value of property beyond its geographic limits. The power of the state to impose taxes is limited to persons, property and business within its boundaries. State Tax on Foreign-Held Bonds, 15 Wall. 300, 21 L. Ed. 179.

In Louisville & N. R. Co. v. Bosworth, 209 Fed. 380, 429, it was contended that the Kentucky statute absolutely required a method of valuation in every case which in some instances would operate to include in the assessment of interstate railroads property not subject to taxation in that state. The court refused to so construe the statute, declaring that to do so would render it unconstitutional. Of a similar assessment it was said in Fargo v. Hart, 193 U. S. 490, 502, 24 Sup. Ct. 498, 501 (48 L. Ed. 761):

"It involved an attempt to tax property beyond the jurisdiction of the state, and to throw an unconstitutional burden on commerce among the states."

And thus it was repugnant to the commerce clause of the federal Constitution. Article 1, § 8.

In later decisions by the Supreme Court such a mode of taxation has been regarded as violative of the Fourteenth Amendment of the Constitution of the United States, and a taking of property without due process of law. Delaware, L., etc., R. Co. v. Pennsylvania, 198 U. S. 341, 25 Sup. Ct. 669, 49 L. Ed. 1077; Union Refrigerator Transit Co. v. Kentucky, 199 U. S. 194, 202, 26 Sup. Ct. 36, 50 L. Ed. 150, 4 Ann. Cas. 493; Chicago, B. & Q. Ry. Co. v. Babcock, 204 U. S. 585, 592, 27 Sup. Ct. 326, 51 L. Ed. 636; Provident Savings Ass'n v. Kentucky, 239 U. S. 103, 112, 36 Sup. Ct. 34, 60 L. Ed. 167.

In cases where property both within and without the taxing state is practically homogeneous, where there is no evidence indicating so much dissimilarity as to render such a method unfair, the Supreme Court of the United States has upheld apportionments made on a mileage basis.

The issue on which these present cases turn does not appear to have been raised or considered in State v. Wells Fargo & Co., 150 Pac. 836, 845, recently decided by the Supreme Court of Nevada. The methods of valuation and apportionment in the two cases are entirely different, and finally, while the court approved the result, it expressed no opinion as to the method by which the result was obtained. Chief Justice Norcross said:

"Whether the system of determining the valuation of appellant's property, applied by the state board of assessors, was correct or not, it does not appear that it operated to impose an excessive valuation. The fact that erroneous methods may in good faith have been used to determine valuations is immaterial, we think, if an excessive valuation did not result therefrom."

Cleveland, etc., Ry. Co. v. Backus, 154 U. S. 439, 443, 14 Sup. Ct. 1122, 1123, 38 L. Ed. 1041, which is also cited and much relied on by defendants, contains nothing in conflict with the views here expressed. In that case the question was:

"If an assessing board * * * ascertains the value of the whole line as a single property, and then determines the value of that within the state upon the mileage basis, is that a valuation of property outside of the state?"

In reply, Mr. Justice Brewer for the court said:

Assuming "that no special circumstances exist to distinguish between the conditions in the two states, such as terminal facilities of enormous value in one and not in another, * * * the question must be answered in the negative."

[6] 5. It is admitted that the taxes in question are a lien on complainant's property, that if judgment be recovered therefor the property will be sold, and that the lien cannot be removed without paying the full amount of taxes due, together with costs and penalties, if they are awarded. It is denied "that said lien constitutes a cloud on plaintiff's title." It is alleged in the complaint, but not denied in the answer, that plaintiff owns various rights of way and other real prop-

erty in Esmeralda county and Nye county. Under the Nevada statutes (Rev. L. § 3666), a tax deed is conclusive evidence of the title, except as against actual fraud or payment of the taxes by one not a party to the action or judgment.

Under all these conditions, does the lien constitute such a cloud as to entitle complainant to equitable relief? "A cloud on one's title is something which constitutes an apparent incumbrance or defect;" in other words, it is an apparent, but not a valid, incumbrance, or an apparent, but not an actual, defect. If the tax proceedings are invalid on their face, there is no cloud, because that which shows its own invalidity confers no semblance of right or title; for instance, a tax levied under an unconstitutional statute. If the proceedings are valid on their face, but the tax is incapable of enforcement without the production of evidence which will inevitably show its illegality, there is still no clouding of the title which a court of equity will either restrain or remove. But if an action be commenced in the name of the state to obtain a judgment for a tax apparently valid, and the action cannot be defeated, and the tax lien destroyed, without the production of extrinsic evidence showing the illegality of the assessment, the title is clouded, and equity will afford relief. The rule is thus clearly stated by Mr. Justice Field in Pixley v. Huggins, 15 Cal. 127, 133:

"The true test, as we conceive, by which the question whether a deed would cast a cloud upon the title of the plaintiff may be determined, is this: Would the owner of the property, in an action of ejectment brought by the adverse party, founded upon the deed, be required to offer evidence to defeat a recovery? If such proof would be necessary, the cloud would exist; if the proof would be unnecessary, no shade would be cast by the presence of the deed. If the action would fall of its own weight, without proof in rebuttal, no occasion could arise for the equitable interposition of the court, as in the case of a deed void upon its face, or which was the result of proceedings void upon their face, requiring no extrinsic evidence to disclose their illegality. All actions resting upon instruments of that character must necessarily fail. * * * Where the claim of the adverse party to the land is valid upon the face of the instrument, or the proceedings sought to be set aside, as where the defendant has procured, and put upon record, a deed obtained from the complainant by fraud, or upon an usurious consideration, which requires the establishment of extrinsic facts to show the supposed conveyance to be inoperative and void, a court of equity may interfere, and set it aside as a cloud upon the real title to the land."

In Woodruff v. Perry, 103 Cal. 611, 37 Pac. 526, where an injunction had been granted to restrain the enforcement of an assessment, illegal because not properly authorized, Judge De Haven said:

"Inasmuch as the invalidity of such assessment would not appear upon the face of the deed to be given the purchaser at the sale, on account of the tax levied by such assessment becoming delinquent, the plaintiffs are entitled to the injunction given by the judgment appealed from."

The suggestion that the property cannot be sold until after judgment obtained in a tax suit, and that the rules relating to removal of cloud on title to real estate therefor do not apply, is met by the reasoning in the case of Bolton v. Gilleran, 105 Cal. 244, 38 Pac. 881, 45 Am. St. Rep. 33. The court there, having found that an assessment for sewer construction in San Francisco had not been properly determined by the board of supervisors, said:

"The right of the plaintiff to maintain the action is clearly established. The statute makes the assessment a lien upon her lands, and there is nothing upon the face of the assessment to show that the lien is not in all respects valid. If, by reason of matters outside of the assessment as it is recorded, this apparent lien may be shown not to be a valid incumbrance, the assessment constitutes a cloud upon her title which she is entitled to have removed; and, although she can assert the same matters as a defense to any action for the enforcement of the assessment, she is not required to wait until such action may be brought, and, in the meantime, suffer the injury of having the title to her lands impaired by this apparent lien, but may herself invoke the equitable aid of the court to remove the cloud, and to enjoin the holder of the assessment from asserting any claim upon her lands by virtue thereof."

See, also, Gregg v. Sanford, 65 Fed. 151, 157, 12 C. C. A. 525.

It is needless to show that the jurisdiction of a court of equity to remove a cloud is coextensive with its authority to restrain action which will cast a cloud on the title to real estate.

The method of calculating and fixing the assessment of complainant's property in Nevada, and the misapplication of the rule for the apportionment of the value of homogeneous property between two jurisdictions, does not necessarily appear in the tax records which would be produced in court, to constitute a prima facie case in support of the tax lien, or to obtain a judgment for the taxes in question.

[7, 8] 6. Capitalizing the earnings of the whole property, and ascribing the total value thus found to the distributing lines as a method of fixing value for taxation, has little to commend it. Under such a rule overvaluation is inevitable. If this be intended, it is plainly illegal. If the purpose of the Nevada Tax Commission is to secure the company's intangible or franchise values, it is unjust, because all such values, if any there be, are thus arbitrarily attributed to a portion of the property, the whole of which is being operated at a profit. Furthermore, as we have seen, defendants' evidence negatives the existence of any substantial franchise values.

The value of this property assumed for rate making and income regulation by the Nevada Public Service Commission exceeds its value for taxation as determined by the Nevada Tax Commission, and from the former all franchise values were excluded. Mr. Shaughnessy, at the instance of defendants, testified that:

"Complainant has not been singled out for individual attack. The other companies coming within the provisions of section 5 of the Nevada Commission Act are assessed and taxed in the same manner as the Power Company."

He followed this with a detailed statement, showing that 12 such companies in the year 1913 paid in Nevada taxes ranging from 5.6 per cent. to 34.6 per cent. of their gross earnings. A similar admission is made in the answer.

If the method applied operates fairly in some cases, but not in others, and in this particular instance has resulted in gross overvaluation of plaintiff's property, under such circumstances that the assessing officers must have known the assessment was wrong, it may be regarded as intentional, on the theory that every man is presumed to intend the natural consequences of his acts.

An assessment is not necessarily fraudulent because it is excessive, if the assessor has not acted from improper motives. But if an as-

sessment is purposely and intentionally made too high, or if this is done arbitrarily and capriciously, without regard to actual values, or in intentional disregard of law, for the purpose of adding to the burdens of the owner, as where it is knowingly assessed at more than double the sum other property of the same class and value is assessed, it is a fraud on the owner. 2 Cooley on Taxation (3d Ed.) p. 1459; Johnson v. Wells Fargo Co., 239 U. S. 234, 243, 36 Sup. Ct. 62, 60 L. Ed. 243; 1 High on Inj. §§ 500, 504; Royal Salt Co. v. Bd. of Com'rs, 82 Kan. 203, 107 Pac. 640; Merrill v. Humphrey, 24 Mich. 170; Citizens' Nat. Bk. v. Bd. of Com'rs, 83 Kan. 376, 111 Pac. 496; Cal. & O. Land Co. v. Gowen (C. C.) 48 Fed. 771; Pacific Postal Tel. Co. v. Dalton, 119 Cal. 604, 51 Pac. 1072; Judge Cooley, in discussing this question, says:

"A tax founded on a fraudulent assessment will be enjoined. An assessment is not fraudulent merely because of being excessive, if the assessors have not acted from improper motives; but if it is purposely made too high through prejudice or reckless disregard to duty in opposition to what must necessarily be the judgment of all competent persons, or through the adoption of a rule which is designed to operate unequally upon a class and to violate the constitutional rule of uniformity, the case is a plain one for the equitable remedy by injunction." 2 Cooley on Taxation (3d Ed.) p. 1459.

In Northern Pac. Ry. Co. v. Clearwater County, 26 Idaho, 455, 470, 144 Pac. 1, 5, it was said that:

"Where the valuation is so unreasonable as to show that the officer must have known it was wrong, and that he could not have been honest in fixing it, such a valuation is clearly a fraud upon the owner."

In State v. Central Pac. Ry. Co., 7 Nev. 99, it was held that an excessive valuation made by an assessor, contrary to his official judgment, and with intent to injure, is a fraud, against which the law will afford relief. In that case the issue was raised on demurrer to the answer. In the answer it was charged that, while the assessor knew and believed $6,000 per mile to be the fair value of the Central Pacific Railroad in Humboldt county, nevertheless he assessed it at $15,000 per mile.

In Oregon & C. R. R. Co. v. Jackson County, 38 Or. 589, 602, 64 Pac. 307, 311, Judge Wolverton, speaking of valuations made by assessors and reviewed by boards of equalization, says:

They "are not subject to review or revision, except in the manner pointed out by law, nor can they be disturbed or annulled, except when they proceed arbitrarily and in willful disregard of the law intended for their guidance and control, with the evident purpose of imposing unequal burdens upon certain of the taxpayers. In the latter case, their acts being designedly oppressive and fraudulent, equity will interpose to prevent the consummation of such purpose, as there exists no adequate, certain, and complete remedy at law. * * * Relief by action presupposes a submission to a fraudulent and oppressive act by payment of a void tax before it can be invoked."

This was said in sustaining a perpetual injunction against the collection of taxes levied on the roadbed and certain lands of the railroad company. It appeared that the assessor in order to further his election, had promised to assess the company's roadbed and lands at certain figures. The finding was that he had—

"proceeded with the purpose of setting a preconceived and arbitrary value, * * * without respect to their relative value as compared with other

real property assessed in the county, and that the assessment was capricious-
ly made, * * * and it is so largely in excess of all other assessments of
like roadbeds within the state as to carry with it the presumption that the
board of equalization adhered to the overestimate by design, for the purpose
of discrimination."

[9, 10] 7. It has been persistently urged that plaintiff—

"has a plain, speedy, and adequate remedy in the state courts in the ordinary
course of law, and may avail himself of the provisions of section 7 of the
Nevada Commission Act, or he may tender the amount which he claims to be
actually due, and await suit * * * under sections 3657 to 3664, inclusive,
of the Revised Laws of Nevada, and if he tender the proper amount no penal-
ties will accrue, * * * or he could pay the full amount of the tax under
protest, and maintain an action for recovery of the excess."

I am aware that our Supreme Court, in Wells Fargo & Co. v. Day-
ton, 11 Nev. 161, declared that where illegally assessed taxes on per-
sonal property are paid under protest, and received by the county, an
action at law will lie against the county for the recovery of the money.
This decision has been followed in Robinson v. Longley, 18 Nev. 71,
1 Pac. 377, and Barnes v. Woodbury, 17 Nev. 383, 30 Pac. 1068, and
is not at variance with the rule in Conley v. Chedic, 7 Nev. 336. In
each of these cases the tax was claimed to be void as a whole; it was
not levied on real, but on personal, property. In such a case it is usual-
ly difficult to find any ground of equitable jurisdiction, and damages
are recoverable at law. 2 Cooley on Taxation (3d Ed.) p. 1415.

I have found nothing in the Nevada law or decisions, prior to Act
March 20, 1913, creating the Tax Commission, which lends any sup-
port to the theory that when a tax, unjust and illegal in part only, has
been paid under protest, the unjust excess can be recovered in an ac-
tion at law. Stanley v. Supervisors, 121 U. S. 535, 549, 7 Sup. Ct.
1234, 30 L. Ed. 1000, was an action to recover taxes paid under pro-
test. Stanley, the assignee, claimed that the taxes were illegal, because
national bank stockholders were not permitted to deduct from the total
assessed value of their stock the amount of their just debts, while by
the laws of the state owners of all other taxable personal property
could deduct such debts from its assessed value. It was further
charged that the assessors intentionally assessed shares of stock in the
National Exchange Bank at a greater rate in proportion to their value
than other property. The court, speaking by Mr. Justice Field, said:

"It is only where the assessment is wholly void, or void with respect to
separable portions of the property, the amount collected on which is ascertain-
able, or where the assessment has been set aside as invalid, that an action at
law will lie for the taxes paid, or for a portion thereof. Overvaluation of
property is not a ground of action at law for the excess of taxes paid beyond
what should have been levied upon a just valuation. The courts cannot, in
such cases, take upon themselves the functions of a revising or equalizing
board."

8. There is much authority for the rule that, in the absence of statu-
tory permission, a tax voluntarily paid cannot be recovered; the theory
being that every man knows the law, and if, with a full knowledge of
material facts, he makes a payment which the law would not compel
him to make, the payment is voluntary, and he is not entitled to the
aid of a court for its recovery. This is especially true as to the pay-

ment of taxes on real property. The process of levying and collecting taxes is so well and generally understood, the taxpayer has such ample opportunity to investigate the legality of the claim which will be made, and to resist it, if unjust, that the courts have usually regarded the payment of a tax as voluntary, even when made unwillingly, or under protest. Union Pac. R. Co. v. Bd. of Com'rs, 222 Fed. 651, 653, 138 C. C. A. 175; 2 Cooley on Taxation (3d Ed.) p. 1495; 2 Paige & Jones on Taxation, § 1478.

It is unnecessary to pursue this discussion further, however, as the matter has been set at rest by statute. Section 7 of the act creating the Nevada Tax Commission, approved March 20, 1913, reads as follows:

"Any property owner who has initiated a court proceeding' for redress from any increased valuation of his property for assessment purposes, and who shall have paid his December installment of taxes thereon in full, may, on filing with the treasurer of the county a certificate of the clerk of any court that such issue is pending, pay his June installment in two separate payments, to wit: One payment in a sum which, when added to the December installment, shall represent the amount of taxes payable if computed on the valuation of the preceding fiscal year, plus the taxes on any improvements added since such preceding levy, and the other for the balance required to make up the full June installment; and said county treasurer shall receipt for the latter as a special deposit, to be held by such treasurer, undisbursed, until the court by its finding shall award it; and said property owner, in such case, *shall not be liable for any penalty under the delinquent tax act;* and if the court by its findings reduce the assessment valuation of such property, said county treasurer, on order of the court, shall refund from such special deposit an amount corresponding to such reduction, and shall transfer the remainder to the public revenues, and if the court shall not reduce the valuation of said property, then said county treasurer shall transfer the entire special deposit to the public revenues." Laws Nev. 1913, c. 134.

In the section quoted, the Legislature has provided a method for recovering excessive taxes paid under protest. If this method is not exclusive, it is superfluous. If one may recover any illegal tax which he pays under protest, of what avail is a suit which expressly permits him a recovery out of the June installment of taxes? Section 7 could have had no other purpose than to change a rule, or an uncertainty which theretofore obtained. By thus providing for the recovery of taxes out of the June installment, it necessarily restricted recoveries to that installment, and to that portion of the June installment which the county treasurer receipts for as a special deposit. Clearly recovery can be had only in the manner and under the circumstances defined in the statute. As was said in District Township v. City of Dubuque, 7 Iowa, 262, 284:

"The expression of one thing is frequently the exclusion of another; and if, by a law or Constitution, a thing is to be done in a particular manner or form, this, as we have seen, includes a negative, that it shall not be done otherwise. * * * This rule, it is also said, is further modified by another, that where the means for the exercise of a granted power are given, no other or different means can be implied, as being more effectual or convenient."

To the same effect see 36 Cyc. 1122; Johnson v. Baker, 167 Cal. 260, 139 Pac. 86, 88. In the last-mentioned case the court held that

affirmative expressions in a statute introducing a new rule implied a negative of all not within their purview.

If the Power Company complies with the foregoing statute, it will pay for its December installment of taxes $26,758.91, or one-half of $53,517.82, the total amount of tax assessed for the year 1914. The entire amount of tax admitted by complainant to be due is $17,703.85; consequently, in order to avail itself of the remedy provided in section 7, if we assume that the merits of this controversy are with complainant, it would be required to pay into the county treasuries of Nye and Esmeralda more than $9,000 in excess of the whole amount of taxes which it believes to be lawfully assessable against it for the entire year. Under the conditions of this case, the relief which complainant could have under section 7 would be wholly inadequate. The statute provides no method for refunding the $9,000, in case the assessed valuation is reduced by order of the court to the figures contended for by complainant. King County, Wash., v. N. P. Ry. Co., 196 Fed. 325, 116 C. C. A. 143.

[11, 12] 9. In the present case, paying the taxes and bringing action for their recovery affords a relief neither adequate nor complete. The remedy is restricted by statute, and a resort thereto, if successful, would yield but partial relief. If the Power Company be remitted to its defense in a tax suit, under sections 3657 to 3664 of the Revised Laws of Nevada, the actions must be brought in the name of the state, and in the counties where the assessments are made. Section 3659. Such an action could not be removed to a federal court on the ground of diverse citizenship, because the state is not a citizen. Stone v. South Carolina, 117 U. S. 430, 6 Sup. Ct. 799, 29 L. Ed. 962; Title Guaranty, etc., Co. v. State of Idaho, 240 U. S. 136, 36 Sup. Ct. 345, 60 L. Ed. 566.

It is impossible to assume that such an action could be removed to this court on the ground that it does or may involve a question arising under the Constitution or laws of the United States. In such an action the complaint will undoubtedly follow the statutory form prescribed in section 3661, in which it is unnecessary to show that the action will involve federal or constitutional questions; and it is unreasonable to suppose that the pleader will raise them. But, conceding that such issues may appear in the pleadings, nevertheless it will avail nothing in this connection, because there can be no removal on such grounds unless they necessarily appear in the complaint, and that, too, unaided by anything alleged in anticipation or in avoidance of defenses which may be interposed. Adams v. Chicago Great Western R. Co., 210 Fed. 362; Tennessee v. Union & Planters' Bank, 152 U. S. 454, 14 Sup. Ct. 654, 38 L. Ed. 511; Taylor v. Anderson, 234 U. S. 74, 34 Sup. Ct. 724, 58 L. Ed. 1218; Western Union Tel. Co. v. S. E. & St. L. Ry. Co., 208 Fed. 266, 268, 125 C. C. A. 466; Minnesota v. Northern Securities Co., 194 U. S. 48, 66, 24 Sup. Ct. 598, 48 L. Ed. 870; Storm Lake T. & T. Factory v. Minneapolis & St. L. R. Co., 209 Fed. 895; Moon on Removal of Causes, pp. 101, 102.

In Western Union Tel. Co. v. Railway Co., supra, an Illinois case, it was held that:

235 F.—22

"A suit cannot be removed as one arising under the Constitution, laws, or treaties of the United States, unless such fact appears by plaintiff's statement of his own claim. * * * If it does not so appear, the omission cannot be supplied by averment in the petition for removal or in the subsequent pleadings."

Consequently, if the Nevada-California Power Company be denied a hearing because relief is afforded in a tax suit in a state court, it will be deprived of the right to have its cause tried in a federal tribunal, notwithstanding the fact that the essential elements of federal jurisdiction, such as diverse citizenship and requisite amount in controversy, as well as an alleged constitutional right violated, are present.

[13-16] 10. Section 267 of the Judicial Code (Rev. Stats. § 723 [Comp. St. 1913, § 1244]) provides that suits in equity shall not be sustained in any court of the United States in any case where a plain, adequate, and complete remedy may be had at law. This has been the statutory rule since the first session of Congress in 1789. The courts, however, have invariably interpreted it to mean that the equity jurisdiction of the federal courts is independent of local law, and cannot be directly abridged by any action of the state, and, except as changed by congressional action, is coextensive with the equitable jurisdiction of the English Court of Chancery at the time of the Revolution. Peck v. Ayers & Lord Tie Co., 116 Fed. 273, 53 C. C. A. 551; McConihay v. Wright, 121 U. S. 201, 206, 7 Sup. Ct. 940, 30 L. Ed. 932. As Judge Storey says in the leading case of Bean v. Smith, Fed. Cas. No. 1,174:

"The equity jurisdiction of the courts of the United States does not depend upon what is exercised by courts of equity or courts of law in the several states, but depends upon what is a proper subject of equitable relief in courts of equity in England."

While this is strictly true as to those rights and duties for which the federal laws and Constitution furnish a definition, there is a broad field of jurisprudence, covered by state legislation, within which substantive law is subject to frequent changes. To these changes the federal courts must of necessity accommodate themselves. For instance, there was a time when a court of equity could award a decree of strict foreclosure, cutting off all rights of redemption; but when the state gave the mortgagor a right to redeem within a limited period after foreclosure sale, the right at once became as obligatory on federal courts sitting in equity as on state courts. Brine v. Insurance Co., 96 U. S. 627, 24 L. Ed. 858.

Recently Colorado adopted a statute permitting the taxpayers to maintain an action against the board of county commissioners to recover invalid taxes paid under protest. This was held to be a change in the substantive law, creating a new remedy, which could be enforced in the federal courts, if essential facts of jurisdiction, such as diverse citizenship and the requisite amount in controversy, were present. It was also held that such a statute furnishes a plain, speedy, and adequate remedy at law, which in general would exclude the jurisdiction of equity to enjoin the collection of a tax. But it must be noted that this, though a remedy at law, was quite as available in the national courts as the remedy by injunction had been prior to the adoption of

the statute. There was no denial of the right to invoke the assistance of the federal court in a proper case, nor did it in any manner narrow the jurisdiction of the federal courts. Singer Sewing Mach. Co. v. Benedict, 229 U. S. 481, 485, 33 Sup. Ct. 942, 57 L. Ed. 1288; Union Pac. Ry. Co. v. Bd. of Com'rs, 217 Fed. 540, 133 C. C. A. 392.

In Cable v. United States Life Ins. Co., 191 U. S. 288, 24 Sup. Ct. 74, 48 L. Ed. 188, a bill to cancel a policy of insurance, and to enjoin an action in the state court by the administratrix of the deceased policy holder, was dismissed on the ground that the insurance company had an adequate remedy at law in the action already brought in the state court; but the court called attention to the fact that the action sought to be restrained was removable to the federal court. The federal court has always set its face steadily against the doctrine that the state, by granting a remedy at law available exclusively in its own tribunals, can restrict the equitable powers of the national courts. Obviously, to hold otherwise is to hold that the state can abridge the jurisdiction of the federal court. 1 Pomeroy on Eq. Jurisp. § 292; 1 Pomeroy, Eq. Remedies, § 367; In re Tyler, 149 U. S. 164, 189, 13 Sup. Ct. 785, 37 L. Ed. 689; Western Union Tel. Co. v. Trapp, 186 Fed. 114, 121, 108 C. C. A. 226.

11. In order to supersede and displace an equitable remedy existing in the federal court, a legal remedy provided by the state statute must be one which is equally available in the federal or state courts, where the former has jurisdiction. This must be so, if the basic idea of federal jurisdiction is sound. Why should diverse citizenship confer jurisdiction, unless in such cases more adequate, full, and complete relief can be had in a federal court than elsewhere?

National Surety Co. v. State Bank, 120 Fed. 593, 52 C. C. A. 657, 61 L. R. A. 394, was a suit to restrain the bank from enforcing an unconscionable judgment. The defendant contended that the legal remedy by petition to vacate or modify the judgment in the court which rendered it was full, complete, and adequate. In reversing the decree dismissing the bill, Judge Sanborn, speaking for the Circuit Court of Appeals, said:

"It is a general rule that the absence of an adequate remedy at law is a sine qua non of jurisdiction in equity, and it is earnestly insisted by counsel for the appellees that the complainants in this suit were entitled to no relief in equity in the Circuit Court of the United States, because they had an adequate remedy at law in the state court which rendered this judgment, under these provisions of the Code of Nebraska. There are, however, many reasons why this contention cannot be sustained. The first, and one that is fatal to the position, is that it is an absence of an adequate remedy at law in the national courts, and that alone, which conditions jurisdiction in equity in those courts, and the appellants have no such remedy. The fact that they have a remedy at law in the state courts is not material."

In Smyth v. Ames, 169 U. S. 466, 516, 18 Sup. Ct. 418, 422 (42 L. Ed. 819) notwithstanding the fact that the Nebraska statute provided a special remedy at law for any unreasonable action of the state board of transportation in the matter of rates and fares, it was said:

"The adequacy or inadequacy of a remedy at law for the protection of the rights of one entitled upon any ground to invoke the powers of a federal

court is not to be conclusively determined by the statutes of the particular state in which suit may be brought. One who is entitled to sue in the federal Circuit Court may invoke its jurisdiction in equity whenever the established principles and rules of equity permit such a suit in that court, and he cannot be deprived of that right by reason of his being allowed to sue at law in a state court on the same cause of action."

In Brun v. Mann, 151 Fed. 145, 153, 80 C. C. A. 513, 521, 12 L. R. A. (N. S.) 154, it was said that:

"It is an absence of an adequate remedy at law in the national courts, and that alone, which conditions jurisdiction in equity in those courts, and the complainant had no such remedy. * * * The fact that he had a remedy at law in the state courts is not material."

Coler v. Board of Com'rs (C. C.) 89 Fed. 257, was an application for an order restraining county officials from applying certain funds for any purpose except in payment of interest on certain bonds. The defendants urged there was an adequate remedy at law. The court said:

"Such a remedy might perhaps be found in the practice under the Code. But this will not affect the ancient and well-established jurisdiction of the court of equity. 'The adequacy or inadequacy of a remedy at law for the protection of one entitled on any ground to invoke the powers of a federal court is not to be conclusively determined by the statutes of the particular state in which suit may be brought.' Smyth v. Ames, 169 U. S. 516, 517, 18 Sup. Ct. 422 [42 L. Ed. 819]. The test is: Has he a remedy at law in this court? If he has not, then a court of equity has jurisdiction."

To the same effect see Stanton v. Embry, 46 Conn. 595; Bean v. Smith, 2 Mason, 252, Fed. Cas. No. 1,174; Mayer v. Foulkrod, Fed. Cas. No. 9,341, 4 Wash. C. C. 349; Singer Sewing Mach. Co. v. Benedict, 179 Fed. 628, 633, 103 C. C. A. 186; Hoey v. Coleman (C. C.) 46 Fed. 221, 223.

The permissible affirmative defenses available in a tax suit are stated in section 3664 of the Revised Laws of Nevada as follows:

"First—That the taxes have been paid before suit.

"Second—That the taxes with costs have been paid since suit, or that such property is exempt from taxation under the provisions of section 5 of this act.

"Third—Denying all claim, title or interest in the property, assessed at the time of the assessment.

"Fourth—That the land is situate in and has been duly assessed in another county, and the taxes thereon paid.

"Fifth—Fraud in the assessment, or in failing to comply with the provisions of this act; or that the assessment is out of proportion to and above the actual cash value of the property assessed: Provided, however, that in such last mentioned case, where the defense is based upon the ground that the assessment is above the value of the property, the defense shall only be effectual as to the proportion of the tax based upon such excess of valuation, but in no such case shall an entire assessment be declared void."

The only possible defenses available to the Nevada-California Power Company under this statute are set out in the fifth subdivision. Such defenses are equitable. The fact that they are available in a tax suit does not change their essential nature. It is a plain, adequate, and complete remedy at law, not an equitable remedy in a statutory action in a state court, which relieves a court of the United States of its authority to sustain a suit in equity.

The assessment complained of is the decision and judgment of a Tax Commission. It has much of the force and effect of a judgment. In our revenue system the Tax Commission is a quasi judicial body; its judgments affect the people more universally and more sharply than those of any other court. It grasps what otherwise would be the property of the individual, and its decrees are executed by methods most drastic. Its decisions, if rendered in accordance with law, as to matters within its jurisdiction, are conclusive, in the absence of fraud, save as otherwise provided by statute. State v. C. P. R. R. Co., 21 Nev. 179, 26 Pac. 225, 1109.

This is true, notwithstanding the statutory suit for the collection of taxes. Such suits are in no sense to be regarded as an assessment de novo; the suit is essentially and substantially a procedure provided by the state, to be employed exclusively in its own courts, wherein a dissatisfied taxpayer may attack the judgment of the tax commission. I say exclusively, because the statute designates the state court in which such actions shall be brought, and requires them to be commenced in the name of the state, and, inasmuch as the state is not a citizen, there can be no removal to the federal courts on the ground of diverse citizenship.

The assessment which is complained of here is regular on its face, but it includes values of property beyond the jurisdiction of this state. The inclusion was not inadvertent, unintentional, or through mistake; it was made deliberately and intentionally. In State v. V. & T. R. R. Co., 23 Nev. 283, 292, 46 Pac. 723 (35 L. R. A. 759) it was held the defense "that the assessment is out of proportion to and above the actual cash value of the property assessed" could not have been made in a tax suit until it was authorized by statute in 1895. In Stanley v. Supervisors, 121 U. S. 535, 7 Sup. Ct. 1234, 30 L. Ed. 1000, an action at law to recover taxes, it was held that an overvaluation of property is not a ground of action at law for the excess of taxes.

Balfour v. Portland (C. C.) 28 Fed. 738, was also an action at law to recover taxes on property alleged to have been deliberately overvalued, in disregard of the law requiring uniformity in the valuation of property for taxation. Recovery was denied, because, as the court held, there was no authority for paying the taxes as a whole, and then suing at law to recover the alleged excess. "Such a wrong," the court said, "may be corrected in equity by an injunction against the collection of the excess, on payment of what is justly due * * * a suit to enjoin the collection of this tax, so far as it is based on an improper valuation of the property, could have been maintained by the plaintiffs on the ground of fraud. * * * For such purpose, such an assessment is considered a fraud on the party concerned, against which equity will give relief." Of the assessment the court said:

"The proceeding being quasi judicial, and the subject-matter within the jurisdiction of the officers who conducted it, the result reached is so far conclusive that the legality of it cannot be questioned in an action at law to recover back the one-half of the tax as illegal."

In Western Union Tel. Co. v. Gottlieb, 190 U. S. 412, 23 Sup. Ct. 730, 47 L. Ed. 1116, the tax collector of Jackson county, Mo., brought an action against the county to collect taxes. The defenses offered were that the company's franchise, derived from the United States, could not be assessed, and that the state board had intentionally and deliberately overvalued the property. The Supreme Court of Missouri, and the Supreme Court of the United States as well, held that the second defense could not be entertained, "because it seeks to raise the question of discrimination by a defense to an action at law to collect the taxes, and thereby collaterally attacks the judgment of the board of equalization. * * * Such a question can only be raised by a direct attack in equity."

In Los Angeles v. Ballerino, 99 Cal. 593, 32 Pac. 581, the county brought an action under a California statute to recover taxes. The defendant alleged a fraudulent, corrupt, and exorbitant assessment. The trial court held that this was an equitable defense, and inasmuch as he had failed to allege tender or payment of the amount of tax which would have been due if the land had been fairly assessed, his testimony as to fraud and overassessment was rejected. In holding that no error had been committed, Judge De Haven said (99 Cal. 597, 32 Pac. 583):

"It is undoubtedly true that a taxpayer may enjoin the collection of a tax founded upon an assessment fraudulently and corruptly made with the intention of discriminating against him, and for the purpose of causing him to pay more than his share of the public taxes (Merrill v. Humphrey, 24 Mich. 170; Lefferts v. Board of Supervisors, 21 Wis. 688; Iron Co. v. Hubbard, 29 Wis. 51); and it is equally true that the fact of such a fraudulent assessment would be available to the taxpayer as an equitable defense in an action brought to enforce the collection of a tax founded upon an assessment of that character."

The latest expression of the Supreme Court as to the jurisdiction of federal courts to enjoin the collection of taxes is found in Johnson v. Wells Fargo & Co., 239 U. S. 234, 36 Sup. Ct. 62, 60 L. Ed. 243. The Constitution of South Dakota required that the property of corporations should be assessed as nearly as may be by the same methods as are provided for taxing property of individuals. Notwithstanding this provision, the state board of assessment, while valuing the property of individuals for what it was really worth, in assessing the property of Wells Fargo & Company, gave controlling effect to the gross income of the company. The board attempted to justify this method under a statute which required it to take gross earnings of such companies into consideration. The court was of the opinion that such administration of the statute was in violation of the Constitution, though the statute on its face might be unobjectionable, and held that:

"A valuation for assessment so unwarranted by the law and a method of making the assessment, amounting either to a fraud or such gross mistake as to amount to fraud upon the constitutional rights of the person taxed, are grounds of equity for enjoining the enforcement of the tax."

The court said:

"The contention is made that there was no ground for equity jurisdiction, and that therefore the bill should have been dismissed. This court

has frequently held that a bill will not lie in the federal courts to enjoin the collection of state taxes where a plain, adequate, and complete remedy at law has been given to recover back illegal taxes, and the attack upon the assessment is based upon the sole ground that the same is illegal and void. See Singer Sewing Machine Co. v. Benedict, 229 U. S. 481 [33 Sup. Ct. 942, 57 L. Ed. 1288], where many of the previous cases in this court are reviewed. But in the present case it was alleged not only that the assessment was unwarranted by the law, but that the manner of making the assessment amounted to fraud upon the constitutional rights of the express companies, or such gross mistake as would amount to fraud, thus averring a distinct and well-recognized ground of equity jurisdiction. It also appears that the tax of 1909 had been enjoined similarly, and that from the decree in that case no appeal had been taken. Such continuing violation of constitutional rights might afford a ground for equitable relief."

I am therefore constrained to hold that the inclusion of values beyond the jurisdiction of the state of Nevada in the assessment complained of is a wrong for which complainant is entitled to equitable relief. An injunction pendente lite in each case will therefore issue as prayed for, to protect complainant against the collection of taxes on any valuation in excess of the assessment of June 24, 1914, made by the Nevada Tax Commission. In my judgment no showing has been made which will justify any interference by this court with that valuation.