NEVADA–CALIFORNIA POWER CO. v. HAMILTON, County Treasurer, et al.

SAME v. FRANKLIN, County Treasurer, et al.

(District Court, D. Nevada. March 21, 1917.)

Nos. A–31, A–32.

1. TAXATION ⬅376(1)—AUTHORITY OF STATE—PROPERTY WITHOUT STATE.

A corporation, whose power plant and water rights were located in California, but the greater part of whose transmission lines were in Nevada, where most of the current was sold, cannot be taxed in Nevada, on an assessed valuation in the ratio of its transmission lines in Nevada to its transmission lines in California, on the theory that that proportion of its income was derived from its property in Nevada, even though California has assessed its valuation only in the ratio of its California transmission lines to its total transmission lines.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631.]

2. TAXATION ⬅376(2)—ASSESSMENT—MODE OF TAXATION—INTANGIBLE PROPERTY.

A hydro-electric power company can be assessed on its franchise value, or on its value as a going concern, provided the value of the whole property, as determined by capitalizing its net earnings, is in excess of the sum of the values of its constituent units. Such a valuation may be obtained by subtracting the sum of the values of its several parts from its capitalized value. In determining what is a reasonable return on the property, the court should take into consideration the hazards of the business, taxes, operating expenses, and depreciation. No allowance can be made for depreciation in the case of water rights which are appreciating in value.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 625.]

In Equity. Separate suits by the Nevada-California Power Company against Joseph Hamilton, as Treasurer and ex officio Tax Receiv-

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

er of the County of Esmeralda, in the state of Nevada, and others, and against Nathaniel K. Franklin, as Treasurer and ex officio Tax Receiver of the County of Nye, in the state of Nevada, and others. On final hearing. Decree directed, restraining the collection of taxes on an assessed valuation in excess of the correct valuation as found by the court.

See, also, 235 Fed. 317.

John R. Dixon, of Denver, Colo., and Newman Jones, of Riverside, Cal., for plaintiffs.

George B. Thatcher, Atty. Gen., and H. H. Atkinson, Dist. Atty., of Tonopah, Nev., for defendants.

FARRINGTON, District Judge. The Nevada-California Power Company, a Wyoming corporation, for more than nine years has been engaged at Bishop Creek, Inyo county, California, in the business of generating electric current, which it transmits to and sells in Southern Nevada. All the Nevada property of the company is situated in Nye and Esmeralda counties.

June 24, 1914, the full cash value of plaintiff's property in Nevada was fixed by the tax commission at $1,492,815. Following a uniform rule applied to all similar property in the state, 60 per cent. of this amount was taken for the purposes of taxation, making the assessed value $895,689, of which $328,689 was apportioned to Nye county, and $567,000 to Esmeralda county. In finding this value the commission took into consideration both physical and nonphysical elements, and included therein overhead charges incurred during the period of construction, as well as the franchise. (Tr. p. 8.)

In October, 1914, the power company appeared before the commission, complaining that this assessment was excessive and illegal. Instead of reducing the valuation, the commission raised it to $3,700,713, 60 per cent. of which, or $2,220,427, was fixed as the value for the purposes of taxation. The effect of this change was to increase the Nevada tax of plaintiff from $21,850.29 to $53,517.82. The power company then brought the present suits, both of which have been tried together, and will be decided as one case, though a decree in accordance with the following opinion will be entered in each.

In each bill the plaintiff prayed that it be adjudged that the full cash value of its property in Nevada at any time during the year 1914 did not exceed the sum of $1,220,843; that the valuation fixed for that year by the Nevada tax commission was and is unjust, inequitable, and, in so far as it exceeds 60 per cent. of the said amount, is wholly void and of no effect; that plaintiff be granted writs of injunction, both temporary and permanent, restraining the enforcement of the valuation or orders of the Nevada commission as against plaintiff, or from commencing or prosecuting any actions at law for the enforcement of said values or orders, or for the collection of any tax claimed thereunder, and that the treasurer of Nye county be directed to accept and receive $6,321.25, and the treasurer of Esmeralda county $11,382.-60, or such other sums as the court may adjudge, in full payment of all taxes levied or assessed against the plaintiff in said counties for the year

1914. June 19, 1916, an injunction was issued in both cases, restraining 'the collection of taxes on any valuation in excess of the assessment of June 24, 1914. ' The cases were tried January 25, 26, and 27, 1917.

About 85 per cent. of plaintiff's transmission lines are in Nevada; the remaining 15 per cent., as well as the generating plant, water rights, dams, ditches, and flumes, are in Inyo county, Cal. The gross income of the company for the fiscal year ending June 30, 1914, about 95 per cent. of which was received from sales of electric current in Nevada, was $992,928. During the same period the operating expenses were $339,115, and the taxes for the previous year were $18,435. Within the state of Nevada on the 31st day of December, 1914, "the company owned a total of 246.2 miles of three-phase, 60,000-volt transmission line on wooden poles, seven substations, two switching stations, six distribution systems, with transformers, meters, service connections, etc., a small amount of municipal street lighting system, a concrete office building at Goldfield, and a considerable amount of minor property of various sorts." (Tr. p. 86.)

During that year the physical value of plaintiff's property in Nevada, including overhead charges, as estimated by the engineer for the commission, was $895,000. The physical value of its property in California, exclusive of water rights, was about $2,300,000. The water rights are appraised by plaintiff's engineers at $1,400,000, making a total of $4,595,000 for the entire plant. Mr. Black, appraisal engineer employed by the power company, testifies that the Nevada property in 1914 was worth $1,188,888; Mr. Poole, the chief engineer, says $1,200,000. Mr. Poole also testifies that the properties, exclusive of the water rights, cost $3,500,000, and he estimates the reconstruction cost in 1914 at $3,150,000, and for that portion of the property which is in Nevada $1,080,000. Measured by the market price of its stocks and bonds, the entire property of the company was $5,432,000, but it was admitted during the argument that $1,000,000 worth of the company's property was not used in supplying Southern Nevada with electricity.

The valuation of $3,700,713, fixed by the tax commission on the property in Nevada, was ascertained by ascribing 85 per cent. of the net earnings for the year ending June 30, 1914, to Nevada, and capitalizing the result on a 10 per cent. basis. In detail, the calculation as testified to by Mr. Shaughnessy, chairman of the commission, was as follows:

"I ·have given gross earnings for the fiscal year ending June 30, 1914, $992,928. Thereafter the following deductions were taken: Operating expenses, $339,115; taxes, $18,435; annuity or return on the property, 4 per cent. on $5,000,000; total plant valuation claimed, or $200,000—making total deductions $557,550. Taking that amount from gross earnings leaves net income of $435,378. Taking 85 per cent. of that as creditable to Nevada gives $370,071.30, and that capitalized at 10 per cent. will give $3,700,713. Sixty per cent. of that, which was taken for assessment purposes, gives $2,220,427." (Tr. p. 20.)

No witness has given a higher valuation than $1,200,000 for 'the company's tangible properties, including overhead charges, in Nevada. The difference between this amount and $3,700,713, the value fixed in October, 1914, is $2,500,713. The real character and source of this

increment is disclosed, not only in the method by which it was calculated, but by the reasons given in its justification. The following is from the testimony of Mr. Shaughnessy:

"Mr. Dixon: Q. Now, will you please state to the court just why you ascribed 85 per cent.; in other words, was it because 85 per cent. of the lines of the company were in the state of Nevada, and 15 per cent., as you estimated them to be, in California? A. Yes; that was the basis. ' * * * We also had in mind, I don't know that I should say it had controlling importance, * * * that in California the assessment taken by the authorities on a basis of a 4.6 per cent. factor, applied to the portion of the gross earnings measured to California on the ratio of the (transmission line) mileage within California to the total mileage, * * * gave them a valuation on the physical property of approximately $600,000 or $650,000, and that, in contradistinction to the fact there was something like three million some odd thousand dollars worth of the physical properties of your company actually situate in California. It necessarily followed that the state of California left the balance of the earnings I have used to the state of Nevada for assessment. * * * Q. Yes; but is it or is it not a fact, Mr. Shaughnessy, that in ascribing 85 per cent. you used as the basis for so doing the mileage of the company in this state as contrasted with that in California? A. That was one of the elements. Q. And the other was what you have just explained, of California leaving something' to Nevada? A. That is just it exactly." (Tr. p. 27.)

Mr. Shaughnessy testifies that:

The $3,700,713 "was reached by taking into account the physical value of the property, plus the overhead charges, and plus the capitalization of the franchise value, as determined by the net earnings of your company." (Tr. p. 18.) "The franchise, as we understand it, * * * would be the use value of the property, measured by its earnings, and whatever that might capitalize out for in excess of the physical value—that is, in excess of the physical value and overhead costs—would represent the franchise value; but, as stated before, we did not pursue that method at the January meeting of capitalizing out your net earnings, and undertaking to assign them, as we did at the equalization period in October." (Tr. p. 16.)

[1] The taxes paid in California in 1914, on more than two-thirds of this property, were about $6,600, while the Nevada authorities, on less than one-third of the property, attempted to collect $53,517.82. It is difficult to indulge the idea that the existence of $2,500,713 of use value, or franchise value, or intangible value, can be proven by the mere circumstance that 85 per cent. of the transmission lines are in Nevada, or that 95 per cent. of the company's income was derived from sales in Nevada of electric current manufactured wholly in California, or by the further fact that California authorities had imposed a very low valuation on the company's property in that state. One might with equal propriety attribute 100 per cent. of the net income to the water rights because they are located wholly in California, or to the power plant because it produces all the electric current. But obviously all such methods are merely ascribing values to one portion of the plant which are taken from another. They have no tendency to demonstrate the existence or nonexistence of intangible or use value. If all the company's property had been in Nevada, no such manipulation of values would have been dreamed of.

If there be such a $2,500,713 use value peculiar to the transmission lines in Nevada, it should manifest itself in some evidence that the

transmission lines possess a greater earning power than any other portion of the plant.  It is easy to understand why one man who manages and superintends such a business can earn more than a common laborer, but why $100 put into a dynamo in Inyo county should be less productive of profit to the company than an equal sum put into copper wire and transformers in Nye county is hard to explain or demonstrate. The water power, the power plant, and the lines, when combined and working to one end, constitute an industrial organism, each member of which is necessary to the success of the whole.  We have here a plant the value of which, ascertained by capitalizing its net earnings at 10 per cent., is $4,353,378.  It is owned and operated as a unit.  If a constituent portion which has a tangible value of less than $1,200,000 is valued at $3,700,713, by what process of reasoning can it be demonstrated that the remainder of the plant, which has a tangible value of more than $3,000,000, is worth less than $660,000?  If there be a franchise value, it must show itself in earnings above those necessary to cover operating expenses, to provide for depreciation, and pay a reasonable return on the fair value of the property as a going concern.

There is no evidence that the property is earning enough to pay expenses, depreciation, and a return on $2,500,713, in addition to an adequate return on a value of $4,353,378.  Furthermore, it does not appear that the commission sought any such evidence; it has resorted to a device, the effect of which is to subject property beyond its jurisdiction to taxation in this state.  It is true that in other cases the property of interstate corporations has been apportioned between two adjoining states on a mileage ratio, and in many instances such a method not only operates fairly and justly, but has been approved by the courts.  If the property in this case were homogeneous, that is, if it consisted entirely of one transmission line, if it were a telephone line, a telegraph line, or a railroad, it would be proper to pursue the method which has been used by the commission; but in the present case more than two-thirds of plaintiff's property is located across the line in California, and less than one-third is within the boundaries of this state.  If the state can take 85 per cent. of the total value of the property simply because 85 per cent. of the transmission lines are in Nevada, it would be justified in taking the whole value of the California property for purposes of Nevada taxation, if the generating plant were situated so near the boundary between the two states that the entire transmission line were in Nevada.  This phase of the case was fully discussed in the decision rendered herein, awarding an injunction pendente lite, reported in 235 Fed. 317.  With the conclusion announced in that opinion I am still satisfied.

The valuation, $1,492,815, fixed by the tax commission in June, 1914, is attacked on the ground that it includes intangible values, whereas the company had no such values in Nevada at that time.  In order to sustain this position, plaintiff has introduced testimony tending to show that its net income at the time was insufficient to cover depreciation and operating expenses, and to afford a fair return on the reasonable value of its physical property devoted to the service of the people in Southern Nevada, and consequently there could be no intangible value.  Mr.

Shaughnessy testifies that the amount, $1,492,815, was intended to cover the values of physical properties within the state, the overhead costs ascribable thereto, and the intangible values other than franchise:

"Mr. Jones: Q. In other words, you did not attempt to tax the primary franchise, or right of the company to be and exist as a corporation? A. Not at all; not in that sense; no. Q. And you did not undertake at that meeting to tax, and did not assess any tax against, the right or franchise of the Nevada-California Power Company to conduct and carry on its interstate business within this state? A. Not at all; no such intention. Q. And you did not at that meeting, or at any meeting, undertake or in fact assess any tax upon the Nevada-California Power Company on account of its special franchise to occupy and use public streets and highways within the state of Nevada? A. Not at all, sir." (Tr. p. 17.)

[2] As to the physical value of the transmission lines in Nevada and the plant on Bishop creek, there is no dispute. The only difference is as to the water rights. These I shall appraise at $1,200,000. Plaintiff is entitled to a fair return on the reasonable value of the property which it devotes to the public service. What is a fair return depends largely on the hazard of the investment. If there be no hazard, an annual return of 5 or 6 per cent. is ample. The power company has water rights for which it paid $225,385. It is claimed that in the year 1914 these rights were worth not less than $1,400,000, and it is safe to predict that before the next 15 years have expired, their value will have advanced to $5,000,000. Water power between Bishop creek and the Mexican border is extremely scarce. The growing industries of Southern California are demanding more and more electric current, and as nearby and available coal deposits and oil fields are exhausted, there will be a still greater demand for the power which can be supplied by plaintiff's plant on Bishop creek.

On the other hand, every investment made in a mining camp is hazardous; sooner or later the mines are exhausted. Plaintiff's witnesses testify that the future productive life of Goldfield and Tonopah will not exceed five years. Certain it is that, unless other mines are discovered in that vicinity, the time is not far distant when plaintiff's transmission lines in Nye and Esmeralda counties will have only a salvage value. Hence plaintiff is entitled to a larger rate of income on its Nevada property than on its power plant and water rights in Inyo county. For the same reason it is entitled to no allowance for depreciation on its water rights. There is no evidence that they will ever wear out, decay, or become obsolete. The probable life of the perishable portions of the power plant is not less than 30 years. Hence, I find that 6 per cent. per annum is a fair return on the value of plaintiff's generating plant and water power devoted to the public use in Southern Nevada, and that an annual allowance of 3 per cent. on the value of the power plant is ample to cover its depreciation. I also find that 10 per cent. per annum is not an unreasonable return on the fair value of the company's property in Nevada, and for the purposes of this case I shall assume that it is entitled to an allowance of 10 per cent. per annum for depreciation of the Nevada property.

If these rates are applied to plaintiff's gross income for the year ending June 30, 1914, it will appear that a considerable income has been

realized in excess of what would be a fair return on the aggregate value of its physical properties, including overhead charges. This may be regarded as a return for intangible values. It has frequently been considered that the sum of the values of each distinct part of a great industrial plant is much less than the value of all the parts, assembled together and working as one machine. The water rights, the power plant, and the transmission lines had an added value in 1914 by reason of their union and joint operation as one system, which, if it is evidenced by an income in excess of a fair return on the purely physical value of the separate parcels of property, may be properly assessed for the purposes of taxation.

The gross income for the year ending June 30, 1914, was $992,928; the operating expenses were $339,115; taxes, $18,435; depreciation, 10 per cent. on $1,200,000, the value of the Nevada transmission lines, $120,000, and 3 per cent. on $2,300,000, the value of the power plant, or $69,000. Subtracting the total deductions, $546,550, from the gross earnings, the remainder is a net income of $446,378. A 6 per cent. return on the generating plant valued at $2,300,000, and the water rights valued at $1,200,000, is $210,000. A 10 per cent. return on $1,200,000, the value of the company's Nevada property, would be $120,000. Deducting $330,000, the sum total of reasonable returns, from the net income, $446,378, there will be a balance of $116,378, which is income in excess of what I have found to be a reasonable return on the value of the physical elements of the property, plus overhead charges. If this is capitalized on a 10 per cent. basis, the result, $1,163,780, will be intangible value. No satisfactory reason has been shown why this added value should be attributed to one portion of the property rather than to another. If $1,163,780 is apportioned ratably, $297,131 may be added to the physical value of the Nevada property, making $1,497,131. This amount exceeds $1,492,815, the value fixed by the commission June 24, 1914, by only $4,316. A slight change in the rates which I have assumed to be reasonable returns on the property, or in the amount allowed for depreciation, would render the result thus obtained substantially the same as the amount arrived at by the commission.

The testimony is not sufficient to warrant this court in changing the valuation fixed by the tax commission at its meeting in June, 1914. Decrees will be prepared and entered in accordance with the foregoing opinion. The injunctions issued herein September 16, 1916, will be made permanent. I must add that the attempt to try these cases in the newspapers, while they were pending in this court, is a regrettable incident, and peculiarly reprehensible, because of the unworthy attitude in which the state of Nevada was thus placed.