OTIS STEEL CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7520.   Promulgated March 2, 1927.

1. Depreciation rates based on a physical examination of the assets and consideration of the various factors, such as the extent of operations, effect of repairs, etc., indicative of the amount of wear and tear during the period involved, more accurately represent depreciation sustained than do rates computed by a straight-line method, for the purpose of determining allowable depreciation deductions as well as adjustments of invested capital on account of depreciation sustained in prior years.

2. Good will value of a business purchased determined, for invested capital purposes, by capitalizing the excess of average net earnings over a fair return on tangibles for the five-year period preceding the purchase.

*J. W. Reavis, Esq.,* and *J. C. Little, Esq.,* for the petitioner.
*John D. Foley, Esq.,* for the respondent.

This proceeding results from the determination by the Commissioner of a deficiency in income and profits taxes for the year 1918, in the amount of $298,025.61. The petitioner avers error in the determination of the deficiencies in three respects: (1) In determining invested capital for the year 1918, the Commissioner increased depreciation to be charged off for years prior to 1918, from $1,245,-263.42 to $1,791,657.78; (2) the Commissioner decreased the depreciation charged off by petitioner for the taxable year 1918, from $558,236.33 to $411,770.70, resulting in an increase in taxable income for the year of $146,465.83; (3) the Commissioner refused to allow any amount of invested capital based upon the purchase by petitioner, during the year 1912, of good will having an actual value of at least $770,000.

### FINDINGS OF FACT.

The Otis Steel Co. of Cleveland, Ohio, was incorporated under the laws of the State of Ohio, on January 1, 1912, and is engaged in the manufacture and sale of steel. It was the successor to the Otis Steel Co., Ltd., of Great Britain, which was successor to the Otis Iron & Steel Co. of Cleveland, Ohio. :

The Otis Iron & Steel Co., the original owner corporation, was organized and incorporated under the laws of the State of Ohio, January 13, 1873, and continued in business as such until about January 1, 1890, when all the business and net assets were sold to the Otis Steel Co., Ltd., by a transfer of all the outstanding capital stock to the latter corporation. No data are available showing the consideration which the latter paid the Otis Iron & Steel Co. for its assets. The books of account of the Otis Steel Co., Ltd., are not available, and it is, accordingly, impossible to determine the book values of the property transferred by it to the petitioner. The revenue agent found that an appraisal had been made at about January 1, 1912, which set up the values of the real estate, buildings and equipment, and he used this appraisal as his basis for property accounts as of January 1, 1912, basing his calculations for depreciation on such values, plus subsequent additions to the property accounts. The values or cost of depreciable assets for the years in question is not in dispute. He classified the depreciable assets and attributed to the assets in each classification their useful life; computed the depreciation on a straight-line method, and, in the computation of invested capital, allowed no amount for either good will or intangibles. The Commissioner approved the action of the revenue agent and determined the deficiencies in question.

Petitioner was organized to purchase the assets, business, and good will of the Otis Steel Co., Ltd., and began business with an author-

ized capital stock of $10,000,000—$5,000,000 thereof being 7 per cent cumulative preferred stock and $5,000,000 common stock—and immediately after its organization the petitioner purchased the good will, plant, and business of the Otis Steel Co., Ltd., by issuing $4,145,000 of common stock and $2,764,000 of preferred stock in payment therefor.

The only tangible property owned by the Otis Steel Co., Ltd., was what was known as the "Lakeside Plant," located at Cleveland, Ohio. This was a large and extensive plant, devoted exclusively to the manufacture and sale of steel. When petitioner purchased this plant, it also acquired a large tract of adjoining land and began the construction of an additional unit known as the "Riverside Plant." The "Riverside Plant" was completed in 1914 and the petitioner operated the plant for a few months, but depression in the steel industry forced it, for business reasons, to close down the plant until the year 1916. During the time the Riverside plant stood idle, petitioner maintained a corps of watchmen and machinists to oil the machinery and prevent deterioration of the same.

Petitioner charged off on its books of account depreciation for the years 1912 to 1918, inclusive, in the following amounts:

| | |
|---|---|
| 1912 | $100,000.00 |
| 1913 | 91,987.05 |
| 1914 | 50,000.00 |
| 1915 | 150,000.00 |
| 1916 | 300,000.00 |
| 1917 | 550,000.00 |
| 1918 | 550,000.00 |

The production of steel for the years 1912 to 1918, inclusive, was as follows:

| Year. | Riverside Plant. | Lakeside Plant. | Total. |
|---|---|---|---|
| | Net tons. | Net tons. | Net tons. |
| 1912 | | 82,615 | 82,615 |
| 1913 | | 76,945 | 76,945 |
| 1914 | 8,568 | 68,049 | 76,617 |
| 1915 | 3,073 | 90,015 | 93,088 |
| 1916 | 79,908 | 101,301 | 181,209 |
| 1917 | 183,100 | 97,908 | 281,008 |
| 1918 | 224,257 | 106,806 | 331,063 |

The depreciation charged off by petitioner during the years 1912 to 1918, inclusive, was determined by the company official who was the operating head of the property and who has been with the several companies since 1873. He was familiar with the daily production, the character and degree of use to which the property was put, the character of labor employed, and the average cost of the machinery and equipment used; the experience of petitioner in the

past, reflecting the useful life of its assets, and the repairs made during each year. He did not use the straight-line method, or any mathematical formula, for determining the depreciation suffered during the years in question. The buildings housing the steel plants are merely a shelter for the machinery and are inexpensive, while the machinery and equipment is of a massive character, and the depreciation sustained on the latter is largely in proportion to the actual use. When the machinery and equipment is run to capacity, the depreciation is correspondingly greater than when run to one-half capacity.

The production at the Lakeside plant was not large during the years 1912, 1913, and 1914, and depreciation was calculated on the use to which the machinery and equipment was put, together with the other factors mentioned. The Riverside plant was completed in the last months of 1914, and little depreciation was charged on same during the year 1914. Depreciation charged on the books during the year 1914, on its assets, was relatively small, that year being one of depression, and production was the lowest during the history of petitioner.

The Riverside plant was operated only a few months in 1914, producing a few thousand tons of steel, and was shut down in the first months of 1915 and did not resume operations until 1916. During the years 1912 to 1916, inclusive, ordinary and necessary repairs were made at both plants, as the condition of the machinery and equipment demanded. During the years 1917 and 1918, both plants of the petitioner were operated twenty-four hours per day, seven days a week. The usual shut-downs for repairs were abandoned and only those repairs absolutely required were made. The quality of labor employed during these years was poor. This period of maximum production was taken into account in determining depreciation during the years in question.

The depreciation charged varied in dollars during the several years, but bore a consistent relation to the production of tons of steel. From the date of completion of the Riverside plant, the rate of depreciation per ton of production was as follows:

| Year. | Depreciation per ton. |
| --- | --- |
| 1915 | $1. 611 |
| 1916 | 1. 656 |
| 1917 | 1. 951 |
| 1918 | 1. 661 |

The petitioner purchased the assets, business, and good will of the Lakeside plant from a British corporation in January, 1912, issuing over $3,000,000 of its capital stock for the good will purchased. No books of the predecesssor company are available; they were kept in London and apparently have been destroyed. The examining

revenue agent built up petitioner's invested capital by taking certain appraisals of the physical assets of the Lakeside plant, as of date of purchase, and adding subsequent additions. In his report, the revenue agent stated as follows:

That this satisfactorily determines the proper invested capital to be used for excess profit tax purposes for the year 1917 would be a ridiculous assertion, but it is the best that can be obtained for a tax calculation. *It is evident that the taxpayer is the possessor of a certain valuable good will,* perhaps intangibles, of a value in excess of the amount returned herewith, but the amount cannot positively be determined. (Italics ours.)

The Lakeside plant, at date of purchase, had been established and operated for thirty-nine years, and possessed an established business and a commanding position in the steel industry. Prior to the building of the Lakeside plant, locomotive fireboxes and boilers were made of copper and cast iron. These materials were more expensive than steel, which was thought to be unfit for such use. The predecessor companies spent large sums of money in perfecting suitable steel for use in locomotive fireboxes and boilers. They were pioneers in this field. Their products sold at from $2 to $20 a ton above the market price, without additional cost. The predecessor companies had a dominant position in this field, as well as in the production and sale of steel castings, and sold their products at an increased price, not only to the railroads themselves, but also to builders of locomotives, who were required by their customers to use "Otis Steel." The petitioner issued a financial statement, in 1912, stating it valued its good will at $1,800,000, deriving such figure from a capitalization of its earnings over a period of 10 years.

The net earnings, before deducting for depreciation of the Otis Steel Co., Ltd., from the "Lakeside Plant," and the net tangible assets of said "Lakeside Plant," were as follows, for the years noted:

| Year. | Net tangible assets. | Net earnings before deducting depreciation. |
|---|---|---|
| 1907 | $5, 370, 874. 43 | $629, 777. 18 |
| 1908 | 4, 466, 777. 49 | 401, 100. 64 |
| 1909 | 4, 559, 202. 59 | 511, 544. 05 |
| 1910 | 4, 768, 120. 11 | 787, 252. 51 |
| 1911 | 4, 789, 966. 00 | 479, 551. 06 |
| Average | 4, 590, 988. 12 | 561, 845. 09 |

The above figures are for net earnings, based upon the audit reports prepared by a firm of accountants employed by the Otis Steel Co., Ltd. The values are based upon an appraisal of plant and equipment as at date of acquisition by petitioner, and the appraisal is based on sound values at that time and not on the basis of reproduction cost.

To the value of plant and real estate, at January 1, 1912, have been added values of other tangible assets, as shown by the audit report as at January 1, 1912. After finding the total tangible assets at January 1, 1912, the figures for prior years have been obtained by working backward, giving effect to capital additions as shown by the audit reports for each year. The amount shown as net tangible assets for each year is obtained by adding the tangible assets as at the beginning and end of each year and dividing by two. The average amount shown above for the five years is obtained by totaling the figures for the five years and dividing by five.

The net profits for the years 1907 to 1911, inclusive, should be reduced by depreciation sustained on the property of the Otis Steel Co., Ltd. The maximum depreciation sustained during those years did not exceed $80,000 per year.

OPINION.

MILLIKEN: Two of the three errors alleged by the petitioner relate to depreciation. The Commissioner increased depreciation for the years prior to 1918 and decreased it for the year 1918.

The depreciation written off on the books of petitioner, for the years 1912 to 1918, inclusive, results from an actual physical examination and inspection of its plant, machinery and equipment, made by the official in charge of production and one who, for over thirty years, had been in active touch with the business. He took into consideration the actual use and extent of operations of the plant, the cost and age of the various types of depreciable assets; had before him the experience of the company in the past, reflecting the useful life of its assets; and was intimately connected with repairs made to the machinery and equipment each year. With this information before it, the petitioner charged off depreciation. The amount to be charged off as depreciation has been changed by the respondent, both in years prior to and for the year 1918. We are of the opinion that the long experience of the official of petitioner and the relevant factors which he used in determining depreciation, are to be preferred to depreciation determined upon a straight-line basis. A straight-line basis for depreciation has been adopted by the Commissioner, writing off a specified percentage each year, quite apart from the actual conditions affecting depreciation. Years when production was practically at a standstill have borne the same rate as years in which production was at a maximum. The year 1915, when the petitioner produced 93,000 tons of steel and a large unit of its plants was idle, has borne the same theoretical rate of depreciation as the year 1918, when all the plants of petitioner were operating on a basis of twenty-four hours per day and seven days per week, with

the annual production of 331,000 tons of steel. Which method results in petitioner having the reasonable allowance provided for by statute? The method of the petitioner, which takes into account all factors having an actual bearing upon depreciation—the facts and circumstances peculiar to each year, or the method of the Commissioner, which apparently gives no consideration to such actual facts, but, instead, is based upon a theoretical and mathematical formula? We are of the opinion that the method used by petitioner, of establishing the depreciation actually sustained during the years in controversy, is more accurate and reasonable than the one used by the Commissioner.

We have, after diligence, been unable to find any case where the courts have laid down the rule that depreciation is to be determined by theories or mathematics. The cases are legion, however, holding that the depreciation in each case must be determined from the facts of each particular case. In the *Appeal of Kinsman Transit Co.*, 1 B. T. A. 552, we had occasion to pass upon the factors entering into the determination of a rate of depreciation, and stated:

Depreciation is a matter of judgment, and must be determined from evidence rather than by mathematics or formulas.

In the case of *Landon v. Court of Industrial Relations of State of Kansas*, 269 Fed. 433, the court, in speaking of the question of depreciation, stated:

It may also not be amiss to say further that in my judgment the element of depreciation should not be measured by a theoretical yardstick, but should be determined by a careful consideration of the actual facts touching the physical condition of each particular plant under consideration.

In *Pacific Gas & Electric Co. v. San Francisco*, 265 U. S. 403, the United States Supreme Court stated:

Facts shown by reliable evidence were preferable to averages based upon assumed probabilities.

The courts have also held that the actual personal physical examination of the property by persons competent to testify is to be preferred to a theoretical basis. As the court stated in *Southern Bell Telephone & Telegraph Co. v. Railroad Commission of South Carolina*, 5 Fed. (2d) 77:

My own view is that certainly in a case of this kind the actual personal physical examination of the property by competent witnesses and their estimate and opinion of the actual depreciation is a better guide than any of the theoretical methods that have been suggested. The decisions practically sustain this conclusion. *Pacific Gas & Electric Co. v. San Francisco*, 265 U. S. 403; *Landon v. Court of Industrial Relations of State of Kansas* (D. C.) 269 F. 445; *N. Y. Telephone Co. v. Prendergast* (D. C.) 300 F. 825.

In the case of *Westinghouse Electric & Mfg. Co.* v. *Denver Tramway Co.*, 3 Fed. (2d) 285, the court stated:

. Accrued depreciation is a fact to be ascertained by inspection.

The court in the case of *Pacific Telephone & Telegraph Co.* v. *Whitcomb*, 12 Fed. (2d) 279, in summing up the decisions of the courts relative to the method by which depreciation is to be ascertained, stated:

In other words,. it was held that accrued depreciation is to be ascertained by an inspection of the property—by going and looking at it and making estimates based upon the facts which such examination discloses.

This was just what the petitioner did in ascertaining the depreciation sustained for the years in question.

In the case of *Southwestern Bell Tel. Co.* v. *Ft. Smith*, 294 Fed. 102, one of the questions involved was with reference to depreciation, and the engineers of Fort Smith, Ark., contended that the engineers of the telephone company had not taken into account sufficient allowance for the age of the property. The court, in approving the rate of depreciation used by the plaintiff, stated:

While the city may prescribe rates for telephone service, it is not the owner of the telephone plant. The telephone company is the owner of the plant and operates it. Its officers and employees are charged with the responsibility of its operation. Their experience enables them to form a judgment with reference to the amount to be reserved for depreciation. Until the Interstate Commerce Commission through its investigation shows the amount reserved by the company to be excessive, prudence would dictate that the judgment of the company upon that point should be permitted to stand.

To the same effect, also, see *Re Virginia Railway & Power Co.*, P. U. R. 1922D, 352; *Birmingham* v. *Telephone Co.*, P. U. R. 1919B, 791; *Arkansaw Water Co.* v. *Little Rock*, P. U. R. 1924C, 73.

In view of all the evidence with reference to depreciation sustained and written off by the petitioner for years prior to 1918, we are of the opinion that the invested capital of petitioners for 1918 should be increased by $546,394.36. *Cleveland Home Brewing Co.*, 1 B. T. A. 87; *Russell Milling Co.*, 1 B. T. A. 194; *Rub-No-More Co.*, 1 B. T. A. 228; *When Clothing Co.*, 1 B. T. A. 973; *City National Bank*, 2 B. T. A. 623; *Kansas Milling Co.*, 3 B. T. A. 709; *Northeastern Oil & Gas Co.*, 5 B. T. A. 332. We are also of the opinion that the method used by the petitioner for determining the depreciation applicable to the year 1918, based upon a physical examination of the assets by one fully competent to make such an examination, and taking into consideration the necessary known factors, more correctly represents the reasonable depreciation to which petitioner is entitled, and especially so when it is shown that the Commissioner did not take into account essential factors in determining depreciation on a

straight-line basis. Accordingly, the net income for the year 1918 should be reduced by $146,465.83.

The remaining issue upon which error is alleged relates to the failure of the Commissioner to include any amount in petitioner's invested capital for the year 1918 for intangibles, it being claimed by petitioner that it purchased good will in 1912, which had a cash value at that time of at least $770,000. None of the books of account of the predecessor company are available, they having been destroyed. The report of the revenue agent, which was approved by the Commissioner and upon which the deficiency in question is based, frankly admits, as set forth in the findings of fact, that the petitioner is the possessor of a certain valuable good will. The question is to determine its cash value. The plant purchased in 1912 had been operating for thirty-nine years. An established business and a commanding place in the steel industry were present. The predecessor company had spent a large amount of money in perfecting a steel that was suitable for locomotive fireboxes and boilers. The quality of their work had been excellent, together with the fact that they were pioneers in this field. Without additional cost, they were able to get from $2 to $20 per ton more for steel than their competitors. Concerns, in ordering fireboxes built, specified "Otis Steel." The business was so well established and the demand for its product so insistent that the stability of the business and its earnings were assured when petitioner purchased the plant.

How may the value of good will be established? We are much in the same situation as in determining depreciation. There is no specific rule for the determination of the value of good will. No rigid and unvarying rule can be laid down to govern all cases. Each case must be considered and determined in the light of the facts surrounding and connected with it. In valuing good will, more or less arbitrary rules have been adopted as befit the facts in each case. See *Appeal of Grant Trust & Savings Co.*, 3 B. T. A. 1026. The decisions of the courts of the State of New York, in inheritance tax cases, probably afford the best criterion as a basis for such a valuation. The method used in inheritance tax cases is to average the net profits for a short period of years and multiply the average so obtained by the number representing the number of years' annual profits taken, or, as expressed in some cases, the number of years' purchase. Three years' purchase, based on an average of profits for five years, was taken by the court in valuing good will in *In re Ball's Estate*, 161 App. Div. 79; 146 N. Y. S. 499; and *In re Ulrici's Estate*, 111 Misc. 55; 182 N. Y. S. 516. In the valuation of stock in the well-known firm of Tiffany & Co., the average

annual net profit was multiplied by ten. *In re Moore's Estate*, 97 Misc. 238; 161 N. Y. S. 142. See also *Von Au* v. *Magenheimer*, 115 App. Div. 84; 100 N. Y. S. 659; *In re Bolton's Estate*, 121 Misc. 51; 200 N. Y. S. 325. In *In re Hearn's Estate*, 182 N. Y. S. 363, the court had before it the question of determining the good will value of a dry goods business established since 1879, and stated:

> In view of the length of time during which the business has been established, its reputation, its extensive advertising, and its prominence in the dry goods trade, I think 5 years' average of the annual net profits is a reasonable value of the good will of the business. *Von Au* v. *Magenheimer*, 126 App. Div. 257; 110 N. Y. Supp. 629. But in order to ascertain the average net annual profits, which is to be multiplied by 5, a period of at least 6 years immediately prior to the date of decedent's death should be taken into consideration. The average annual profits thus ascertained, multiplied by 5, would represent the value of good will of the business of James A. Hearn & Son at the date of the decedent's death, if his executors could sell it on that day.

Also compare method used for ascertaining the value of corporate franchises and other intangibles. *People* v. *State Board of Tax Commissioners*, 145 N. Y. S. 226; *Nevada-California Power Co.* v. *Hamilton*, 240 Fed. 485.

Compare the method for valuing good will in *Appeal of Dwight & Lloyd Sintering Co.*, 1 B. T. A. 179; *Appeal of Hampton Co.*, 2 B. T. A. 302, and the published ruling of the Commissioner, A. R. M. 34 (C. B. 2, p. 31).

A consideration of the nature of the business, its known stability with reference to earning power, the length of time during which it had been conducted at time of purchase by petitioner, the extent to which the manufactured product had become known, and the demand for same, convinces us that the good will purchased had a cash value and the same may, in this case, be measured by attributing an 8 per cent return on net tangibles and the excess of the net earnings, after deducting $80,000 for depreciation for the years 1907 to 1911, inclusive, to be capitalized at 15 per cent. The average net profits, after providing for depreciation for the years 1907 to 1911, inclusive, was $481,845.09. Eight per cent on average net tangible assets of $4,590,988.12, or $367,279.05, produces an excess of $114,566.04, which, when capitalized at 15 per cent, results in a good will value of $763,773.60. The value thus obtained, subject to the statutory limitation on intangibles, should be allowed in computing the invested capital of petitioner.

> *Judgment will be entered on 15 days' notice, under Rule 50.*