CORNING GLASS WORKS, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 9826.   Promulgated December 22, 1927.

*Laurence Graves, Esq.*, for the petitioner.
*D. D. Shepard, Esq.*, for the respondent.

772

OPINION.

MILLIKEN: Six questions are presented for decision. Four of them relate to petitioner's invested capital in the year 1921, and two to deductions.

We will first consider petitioner's contention that respondent erred in excluding from its invested capital for the year 1921, intangibles consisting of good will, patents, and a contract, all of which it asserts it acquired in 1911 in exchange for the whole of its then existing capital stock. Petitioner asserts that these intangibles had, at the beginning of the year 1921, a value of at least $233,750 for invested capital purposes.

Respondent contends that, since the primary purpose sought to be accomplished by the consolidation of the Corning Glass Works and the Houghton Glass Co. was to increase the capital stock of the former company, we should disregard the corporate entity of petitioner and hold that the assets of the Corning Glass Works were not bona fide paid in for petitioner's capital stock; and if not sustained in this position, then, that there is not sufficient evidence in the record upon which to base a computation of the value of the intangibles, if any, acquired by petitioner or by reason of the consolidation.

We are thus met at the threshold with the question, What were the legal consequences of the consolidation of the Corning Glass

Works and the Houghton Glass Co.? If respondent's first contention is sound, the result will be that the corporate existence of petitioner must be disregarded and the additional stock, which was issued, held to be in fact a stock dividend paid by the Corning Glass Works. While it was at first the purpose of the officers and stockholders of the Corning Glass Works to increase its capital stock, this plan was abandoned when they discovered that, if adopted, it would result in reducing the corpus of certain trusts to the extent of seventeen-eighteenths of the value of all the stock of the Corning Glass Works included in the trusts. They then resorted to the plan of consolidation set forth in the findings of fact. This plan, when carried into effect, resulted in the dissolution of the Corning Glass Works and the Houghton Glass Co. and the organization of petitioner, which was a new corporate entity entirely distinct from the two old corporations. See sections 7, 8, 9, and 10 of the Business Corporations Law of New York; *People* v. *New York, Chicago & St. Louis R. Co.*, 129 N. Y. 474; 29 N. E. 959; *People* v. *Rice*, 11 N. Y. S. 249; affd. 128 N. Y. 591; 28 N. E. 251. By virtue of the consolidation, petitioner acquired, without deed or other formal transfer, all the assets, tangible and intangible, of the Corning Glass Works. See section 10 of the Business Corporations Law of New York, and *Tonawanda Power Co.*, 3 B. T. A. 1195. Thus a new and distinct corporation acquired the tangible and intangible assets of another corporation in consideration of the issue of its capital stock, or to put the matter in the language of the Revenue Act (section 326 of the Revenue Act of 1921), the assets, tangible and intangible, of the old corporation, were paid in for the stock of the new corporation. No contention is made to the effect that petitioner is not a corporation *de jure*. If respondent's contention is sustained, we would be forced to hold that the issue of stock by petitioner, to the extent that it exceeded the amount of the outstanding stock of the old corporation, was a stock dividend of the latter corporation. Compare *LaBelle Iron Works* v. *United States*, 256 U. S. 377; 3 Am. Fed. Tax Rep. 3113. But this is the very thing which did not happen.

We have before us for consideration, entities and realities which we can not and should not disregard. In *Regal Shoe Co.*, 1 B. T. A. 896, we were urged to disregard a corporate entity and substitute therefor what was suggested to have been the intention of the parties. We there said:

* * * A corporation is not a mere form; it is a substantial legal being whose existence, rights and obligations are matters of substance, the recognition of which has permeated the entire economic existence of the Nation, and neither the Government nor the taxpayer will be heard in a bona fide case, except in extraordinary circumstances, to say that it is a mere fiction to be lightly disregarded. *Cannon Mfg. Co.* v. *Cudahy Packing Co.*, 267 U. S. 333.

Again we said:

We must, therefore, hold that the subsequent expression of original intent can not convert the fact of stock issued for stock into a transaction of stock issued for tangible and intangible corporate assets. We must give heed to the statement of the Supreme Court in *United States* v. *Phellis*, 257 U. S. 156, that " in such matters, what was done, rather than the design and purpose of the participants, should be the test."

In this, as in the *Regal Shoe Co.* case, the proceedings which we are asked to disregard occurred long prior to the adoption of the Sixteenth Amendment and when it could not possibly have been anticipated that there would have been any tax liability under that Amendment. There is no suggestion of lack of good faith.

The first step in the computation is the determination of petitioner's invested capital. Invested capital is purely a statutory concept which is defined in technical and arbitrary terms. In many respects, this conception differs from that adopted in the accounting world. It matters not how inequitably this concept may work out in so far as the taxpayer is concerned, it must be applied strictly. The taxpayer is entitled to have the same character of construction placed upon the statute when it works in his favor as when applied to his detriment. In this proceeding, petitioner has brought itself squarely within the words of the Revenue Act and we should not deprive him of its benefit by speculating as to what might have been the result if another method of procedure had been adopted.

This brings us to the question whether the Corning Glass Works possessed intangibles, whether such intangibles were *bona fide* paid in for petitioner's capital stock; and what value should be attributed to such intangibles at the date of the consolidation, and in 1921, for the purpose of invested capital in the latter year.

Petitioner, in 1911, acquired in consideration of the issue of its then whole capital stock, a business which had been in successful operation since 1868, which out of earnings after the payments of dividends had increased its net worth in the period 1875–1911, thirty-four fold; which owned patents under one of which was produced about 100 per cent of the clinical thermometers used in this country, and others on signal lighting devices which resulted in the revolution of the signal systems of the great railroads, and which had a very valuable contract with the General Electric Co. Since all the assets, both tangible and intangible, of the Corning Glass Works were paid in for the entire capital stock of petitioner, both the tangibles and intangibles of the old company should be held to have been paid in for petitioner's capital stock and such stock should be allocated between them in proportion to the cash value of each to the date of consolidation. See *St. Louis Screw Co.*, 2 B. T. A. 649.

In finding that the intangibles of the Corning Glass Works had at the date of the consolidation a value of not less than $1,200,000, we have taken into consideration the fact that some of the factors which go to make up the real valuation, such as the remaining life of the patents, are not shown by the evidence. We have attributed to the average value of the tangibles for the five years next preceding the consolidation, an earning capacity of 10 per cent, and then capitalized the average net earnings for the same period on the basis of a five-year purchase. This is a formula applicable to a business of a hazardous nature and, generally speaking, would not be applicable to the business of the Corning Glass Works, which at the date of the consolidation, had a record of 43 years of successful, solid, business achievements. The use of this formula in this case takes care of all the absent factors. On the whole case, we are satisfied that the intangibles of the Corning Glass Works, at the date of consolidation, were worth at least the amount found. Compare *Otis Steel Co.*, 6 B. T. A. 358; *Hampton Company*, 2 B. T. A. 302.

Petitioner should be permitted to include in its invested capital for the year 1921, intangibles acquired in the consolidation to the amount of $233,750, which is 25 per cent of the par value of petitioner's outstanding capital stock on March 3, 1917. This amount is less than the actual cash value of the intangibles at the date of consolidation, is less than the par value of petitioner's capital stock attributable to their purchase, and is less than 25 per cent of the par value of the total stock of petitioner outstanding at the beginning of the year 1921.

Petitioner, in its income-tax return, sought to deduct from its gross income for that year, $6,000 of the $240,000 paid to Estabrook & Co. in that year. In its return for 1922, it sought to deduct from its gross income for that year, the remaining $234,000. Respondent refused to allow both deductions. The deduction for the year 1921, was based on the theory that the whole $240,000 paid was a capital expenditure which should be amortized through the remaining life of the corporation, which was 40 years. The remaining $234,000 was sought to be deducted in 1922, for the reason that since the preferred stock was retired in that year, the corporation did not, thereafter, receive any further benefit from the expenditure.

It may be pointed out by way of parenthesis, that it is difficult to say that the life of the stock and the remaining life of the corporation would be the same, since the stock could be retired at any dividend pay period, and was in fact retired in the year 1922.

The first question for solution is whether the whole or any part of the $240,000 paid Estabrook & Co. is deductible at any time. Petitioner has introduced no evidence to add to the provisions of the contract between it and Estabrook & Co. as evidenced by their respec-

tive letters of December 3, 1920, and December 7, 1920. We have before us only the written words of the contract and testimony as to how the contract was performed. The fact that a lump sum of $240,000 was agreed upon as the compensation of Estabrook & Co., the fact that Estabrook & Co. were to take up and pay for all of the $3,000,000 issue before June 30, 1921, and the fact that the whole issue of $3,000,000 was taken by them, clearly indicate that the whole issue was in fact sold. Taking these facts into consideration, the pertinent parts of the contract can be stated in few words. By the contract, Estabrook & Co. agreed to purchase the whole issue of stock ($3,000,000) and pay par therefor. Petitioner agreed to sell the whole issue at that price and to pay Estabrook & Co. $240,000, or $8 per share, for their services and in consideration of the contract, the payments to be made at the option of Estabrook & Co. pro rata as they took the stock.

What is the real meaning and what is the actual result of this contract? On this point we make the following excerpt from *Heryford* v. *Davis*, 102 U. S. 235:

What, then, is the true construction of the contract? The answer to this question is not to be found in any name which the parties may have given to the instrument, and not alone in any particular provisions it contains, disconnected from all others, but in the ruling intention of the parties, gathered from all the language they have used. It is the legal effect of the whole which is to be sought for. The form of the instrument is of little account.

Though the contract industriously and repeatedly spoke of loaning the cars to the railroad company *for hire*, for four months, and delivering them for use *for hire*, it is manifest that no mere bailment for hire was intended.

In *Kelly, Maus & Co.* v. *Sibley* (C. C. A.), 137 Fed. 586, it was held that the recital in a contract that a certain amount was to be paid as a " commission " did not convert a contract of sale into a contract of agency. So in this case the recital in the contract that the sum of $240,000 was to be paid to Estabrook & Co. for their services is of no importance if in fact that firm was not the agent of petitioner. The contract does not attempt to create the relation of principal and agent. The only obligations which Estabrook & Co. owed petitioner were to purchase at an agreed price and take and pay for within a specified time, the whole of the issue of petitioner's preferred stock. When they did this they discharged every obligation imposed upon them by the contract. Nor does the recital, that this sum was to be paid in consideration of the contract, serve to make its payment the true consideration. That consideration is to be found in the mutual promises to sell and to buy. Based upon this consideration, petitioner agreed to sell to Estabrook & Co., its stock at par and upon the receipt of any part of the purchase price to at once return 8 per cent thereof. Boiled down to its essence, the contract was one of

purchase and sale of petitioner's preferred stock for the net price of $92 per share. Compare *Emerson Electric Manufacturing Co.*, 3 B. T. A. 932. Petitioner incurred no deductible loss by reason of the fact that it sold its stock below par. See *Simmons & Hammond Mfg. Co.*, 1 B. T. A. 803; *Cooperative Furniture Co.*, 2 B. T. A. 165; *Chas. H. Lilly & Co.*, 2 B. T. A. 1058; and *Emerson Electric Manufacturing Co.*, supra.

If, however, we go behind the contract and indulge in the supposition that this was a transaction in which Estabrook & Co. acted as the agent of petitioner, the result would be the same. See *Simmons Company*, 8 B. T. A. 631.

We are of the opinion that respondent did not err in refusing to permit petitioner to take the deductions sought. We are further of the opinion that the $240,000 paid Estabrook & Co. is not deductible in any event.

The next question grows out of the one just discussed. It is whether petitioner is entitled to include in its invested capital, as of January 1, 1921, the amount of $122,858, which had been paid in to it prior to January 1, 1921, by its employees in full, for their subscriptions for 1307 shares of its preferred stock. Respondent insists that since petitioner had, previous to accepting the subscriptions of its employees, sold the entire issue to Estabrook & Co., it had no stock to issue to its employees, and that the payments made to it were received by it for the purpose of being paid over to Estabrook & Co. He further insists that the restrictions placed upon these subscriptions were such as to show that the stock did not belong to the employees until it was actually delivered to them in the year 1922.

We have just held that petitioner sold its stock to Estabrook & Company at $92 per share. It thereupon acquired from Estabrook & Co. an option on a certain number of shares at $94 per share. Some of these shares it at once sold to its employees. Of the shares so subscribed, 1,307 were fully paid up prior to January 1, 1921. Looking through all the forms of bookkeeping and check exchanging, we find that petitioner sold its stock at $92, bought it back at $94 and sold again at $94. To the extent of $92 a share, the money paid in by the employees pursuant to their subscriptions never in fact left petitioner's treasury. To that extent the money paid in by the employees for the shares of stock subscribed by them was at once available to the petitioner as capital which it could use in its operations. The fact that the stock was not issued and delivered until 1921, does not alter the fact that petitioner had invested capital to the extent of $92 per share prior to January 1, 1921. Cf. *Manville Jenckes Co.*, 4 B. T. A. 765, and *Middleton Compress & Warehouse Co.*, 1 B. T. A. 1145. Neither do we think that the restrictions placed upon the subscribers affect the conclusion which we have

reached. The stock belonged to the employees from the time they paid for it. The fact that they could not sell it for a certain period was only a temporary limitation on the right of disposition and did not go to the fact of ownership itself. The right of petitioner to repurchase this stock under certain conditions did not transfer to it ownership of the stock. An unexercised option does not confer ownership. See *Western Union Telegraph Co.* v. *Brown*, 253 U. S. 101. Petitioner should, therefore, be permitted to include in its invested capital as of January 1, 1921, the 1,307 shares which it had sold to its employees and which were fully paid for at the rate of $92 per share, or in all, $120,244, if not already allowed to petitioner.

■ Petitioner asserts that the $25,000 paid the Corning Hospital in 1922 was an ordinary and necessary expense and was, therefore, deductible from gross income under section 234(a) (1) of the Revenue Act of 1921. It is to be noted that a corporation does not, like an individual, possess the right to deduct up to a certain percentage of its income, donations made to charities. In cases like this, a donation to a charity can be sustained as a deduction only when it is an ordinary and necessary expense of its business. We have held that payments made to assist in the erection of or repair to churches or similar charities were deductible as ordinary and necessary business expenses in those cases where the payments were made pursuant to a consistent policy of welfare work, and where the result of such payments had a direct and reasonable effect upon the corporation. See *Superior Pocahontas Coal Co.*, 7 B. T. A. 380, and cases cited. In nearly all of these cases, the church or other building was erected in a mill village, the population of which was almost exclusively composed of employees of the corporation and their dependents. In the present case, the hospital was not erected in a village where nearly all of the inhabitants were employees or represented by employees of the corporation, but in a city of over 15,000 people. It also served a large manufacturing plant about two miles from Corning. It was erected at a cost of between $250,000 and $300,000, for the benefit of the whole city. While the fact that petitioner's employees were liable to suffer and did suffer numerous accidents, and while it was a benefit to the corporation that its employees could be hospitalized in their home city, and while no doubt the hospital conferred benefits upon the families of petitioner's employees, it is our opinion that the benefits were incidental, rather than direct. This view is confirmed by the comparatively small amounts paid by petitioner to the hospital during 1921 and 1922. The amount paid in 1922 was less than would have paid for one patient for a whole year. A business expense which is deductible under section 234(a) (1) must be both an ordinary and necessary expense. While not giving to these words a too narrow construction, we can not hold, in this

case, that the contribution to the Corning Hospital was a necessary and ordinary business expense. We are, therefore, of the opinion that respondent did not err in refusing to permit the deduction.

The next question is whether petitioner should have restored to his invested capital as of January 1, 1921, the $250,740.09, which had theretofore been taken as depreciation on petitioner's books and in its income-tax returns and which had been disallowed by respondent.

The facts relative to this issue were stipulated and our findings correspond with the stipulation. While it might have been better if the stipulation had not been stated in such narrow terms, we are of the opinion that upon the facts as stipulated, petitioner should have restored to its invested capital the amount that has heretofore been disallowed by respondent as depreciation for the years 1917 to 1920, inclusive. We are confirmed in this conclusion by the fact that respondent's counsel, at the hearing, in effect confessed error.

Petitioner contends that in computing its invested capital for the year 1921, respondent erred in computing its tax liability for the year 1920. The facts with reference to this issue were stipulated and our findings of fact correspond with the stipulation. Petitioner's invested capital should be readjusted in this respect in accordance with the facts found.

Reviewed by the Board.

*Judgment will be entered on 20 days' notice, under Rule 50.*